State of Nebraska, appellee, v. Kevin J. Watt, appellant.
___ N.W.2d ___

Filed April 12, 2013.    No. S-12-177.

1. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Convictions: Appeal and Error.** In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.

3. **Jury Instructions: Appeal and Error.** Whether jury instructions given by a trial court are correct is a question of law.

4. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

5. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

6. **Homicide: Intent: Weapons.** Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death.

7. **Prior Convictions: Right to Counsel: Waiver: Proof.** Before a prior felony conviction can be used to prove that a defendant is a felon in a felon in possession case, the State must prove either that the prior felony conviction was counseled or that counsel was waived.

8. **Trial: Convictions.** A conviction in a bench trial of a criminal case is sustained if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.

9. **Jury Instructions: Appeal and Error.** Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.

10. **Appeal and Error.** On appeal, a defendant may not assert a different ground for his objection than was offered at trial.

11. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

12. **Jury Instructions.** Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case.

13. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.

14. **Appeal and Error.** When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

15. **Trial: Appeal and Error.** In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument.

16. **Appeal and Error.** Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

17. ____. The plain error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.

18. **Trial: Prosecuting Attorneys.** Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

19. **Trial: Prosecuting Attorneys: Juries.** Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused.

20. ____: ____: ____. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

21. **Trial: Prosecuting Attorneys: Appeal and Error.** When a prosecutor's conduct was improper, an appellate court considers the following factors in determining whether the conduct prejudiced the defendant's right to a fair trial: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.

22. **Postconviction: Effectiveness of Counsel: Records: Appeal and Error.** In order to raise the issue of ineffective assistance of trial counsel where appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review.

23. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

24. **Trial: Effectiveness of Counsel: Evidence: Appeal and Error.** An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.

25. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance

was deficient and that this deficient performance actually prejudiced his or her defense.

26. ____: ____. To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area.

27. ____: ____. To show prejudice, the defendant must demonstrate reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

28. **Effectiveness of Counsel: Presumptions: Appeal and Error.** The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice.

29. **Trial: Attorneys at Law.** Trial counsel is afforded due deference to formulate trial strategy and tactics.

30. **Effectiveness of Counsel: Appeal and Error.** When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel.

31. **Effectiveness of Counsel: Proof.** In an ineffective assistance of counsel claim, deficient performance and prejudice can be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to the lack of sufficient prejudice, that course should be followed.

32. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

33. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

34. **Homicide: Sentences.** When a defendant is sentenced to life imprisonment for first degree murder, the defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence.

35. **Sentences.** A sentencing judge must separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed as modified.

Stuart J. Dornan and Jason E. Troia, of Dornan, Lustgarten & Troia, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Erin E. Tangeman for appellee.

Wright, Connolly, Stephan, McCormack, and Miller-Lerman, JJ., and Irwin and Riedmann, Judges.

Stephan, J.

## I. NATURE OF CASE

Adrian Lessley and Jason Marion were shot during an altercation on the porch of an Omaha, Nebraska, home. Adrian was killed, and Jason was wounded. Kevin J. Watt was charged in connection with the shooting, and following a jury trial, he was convicted of first degree murder, first degree assault, two counts of use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. After sentencing, Watt perfected this direct appeal. We find no reversible error, but we modify the credit for time served as ordered by the district court and affirm as modified.

## II. BACKGROUND

The shooting occurred on the evening of November 10, 2010, at the home of Patricia Marion. Several other persons lived with Patricia, including Sharonda Lewis and her 2-year-old daughter, who lived in a basement bedroom of the home. Patricia's son Jason did not live at her home, but visited regularly because his daughter often went there after school.

In early November 2010, Patricia loaned Lewis a small safe because Lewis had complained that money had been stolen from her bedroom. Lewis stored money and drugs in the safe and kept it in a locked closet in her locked bedroom. Lewis and her boyfriend, Jeromie Wade, had keys to the safe.

On November 10, 2010, Wade told Lewis that the safe was missing. Lewis believed Jason had taken the safe when he was at the house earlier that day. Lewis' keys had also been missing at the time when Jason was at the house, but were later found. Patricia called Jason and asked him to come to the house so she could ask him about the safe. But Wade had already called Jason, and he was on his way back to the house. Jason and his friend Willie Lessley (Will) arrived at the house between 10 and 10:45 p.m. En route, Jason received a call from Will's cousin, Adrian. Jason told Adrian that he and Will were going to Patricia's house because "[t]here was a situation . . . ."

When Jason and Will arrived, Patricia asked Lewis to leave so she could talk to Jason alone. Will waited on the front porch. After speaking with Jason, Patricia believed that he had not taken the safe.

As Jason and Will prepared to leave, Patricia went with them to the front door. Wade arrived in a red or maroon Ford Windstar minivan, which he parked behind Jason's vehicle in the driveway of an unoccupied house immediately east of Patricia's house. Wade called Will over to the minivan. Will told Wade that he did not believe anyone from the house had taken the safe and that Wade should talk to Jason and Patricia.

Jason and Wade then engaged in a heated discussion for approximately 5 minutes. Eventually, Wade, Jason, and Patricia all went inside and Will stayed on the porch. After another 5 minutes, Adrian and his friend Robert McCraney arrived. McCraney testified that he and Adrian went to Patricia's house because either Jason or Will had asked Adrian to come over.

Inside the house, discussion continued about the missing safe. Patricia spoke with Wade, who was still quite upset and seemed to think that Jason had taken the safe. Jason believed his brother had taken the safe, and Jason tried to talk to him about it. By this time, at least two other people had approached the front porch, but Patricia testified that it was too dark to identify them because the porch light did not work. Patricia heard male and female voices coming from the porch, including those of one of Patricia's former foster children, her twin sister, and Lewis. Patricia tried to go out on the porch, but was told she should stay inside.

While inside the house, Wade placed a call on his cellular telephone. At one point, Adrian came inside and told Jason he should tell Wade to leave because Wade was being disrespectful. Adrian and Wade then began arguing. Adrian returned to the porch, and Wade made another call on his cellular telephone. Adrian came inside again and told Jason to tell Wade "to get off his phone." Wade finished his call and then placed the telephone in his pocket.

Adrian and Wade were arguing as they went outside the house. Jason followed them out. At that point, the front of the house was illuminated only by lights in the driveway and the light coming from the windows of the front living room.

By this time, Wade, Adrian, Jason, Will, and McCraney were all on the porch, and Patricia was standing in the doorway of the house. Arguments continued about the missing safe. Will told Adrian that the situation had nothing to do with the two of them, but Adrian said he thought Wade was being disrespectful of Patricia.

As the arguing continued on the porch, a large sport utility vehicle (SUV), identified as a newer, light-colored Chevrolet Suburban, pulled into the driveway of Patricia's house at the west edge of the property. A man identified by Will, McCraney, and Lewis as Watt got out of the SUV. He was wearing a tan hooded sweatshirt, a white T-shirt, and dark-colored jeans. Lewis testified that she knew Watt because his sister is the mother of Wade's children. Will and McCraney had seen Watt around the neighborhood.

Watt came up to the porch and shook Adrian's hand. Adrian said to Watt, "What's up, man? You know me." However, Jason said there was no indication that Adrian had invited Watt to the house. When Watt arrived, Wade's demeanor changed and he became more animated, talking more loudly. After a few minutes, Watt returned to his vehicle and entered the driver's side, but he did not leave. McCraney testified that he told Adrian they should leave because he had a feeling something was going to happen, but Adrian paid no attention to McCraney.

As tensions mounted among those on the porch, a fistfight erupted between Adrian and Wade. Jason, Will, Lewis, and Patricia's former foster daughter all tried to break up the fight, to no avail. During the fight, McCraney looked toward the west driveway and saw Watt near the rear of the SUV. Watt had pulled up the hood of his sweatshirt. Watt then walked over to the driver's side of Wade's minivan in the other drive-way. McCraney turned his attention back to the fight on the porch, and when he looked back toward the driveway, he saw Watt on the sidewalk in front of the minivan holding a

rifle, which McCraney believed was either an AK-47 or an SKS. McCraney turned away, knowing he needed to leave the porch, and then heard gunshots. McCraney said he tried to get Adrian to go with him, but Adrian had been shot. McCraney heard three or four shots, jumped off the porch as the gunshots continued, and ran to a building south of the house, where he called the 911 emergency dispatch service. The women who had been on the porch crawled into the house to escape the gunfire. Jason said he heard gunshots and felt a sensation in his arm and chest. He bounced up against the house and then heard rapid fire. Jason covered his face and took cover against the house.

Will testified that he heard two gunshots as he was trying to break up the fight. He ducked down the porch stairs and saw Watt standing in the yard with a rifle in his hands. Will saw Watt fire three or four shots. Will was able to identify Watt because each time a shot was fired, the gun would flash and illuminate the shooter's face. Watt was standing 10 to 15 feet from the bottom porch step. Will squatted behind the east pillar at the bottom of the porch steps to avoid the gunfire. Will covered his head and heard several more shots fired.

Lewis stated that she initially froze when she heard the gunshots, but after she saw Adrian lying on the porch, she jumped over the porch and ran behind the house. When she found the other doors to the house locked, she came around the front on the opposite side of the house and saw Watt's SUV as it left the driveway.

After the gunfire stopped, a woman who had been inside the house during the shooting walked to the front door and saw Watt get into the SUV and back it out of the driveway. A neighbor testified that she heard six or seven gunshots just before 11 p.m. She looked out her bedroom window and saw a silver SUV "flying down the street" to the east, no more than 1 minute after she heard the last gunshot.

After the SUV fled the scene, Jason called Will to come up on the porch. Will saw that Jason was bleeding heavily from a gunshot wound and that Adrian was dead. Jason was leaning against the door while trying to pull out a .45-caliber handgun from his waistband. Jason had trouble gripping the handgun

with his right hand because of his injuries. Wade went to Jason and slapped the handgun out of his hand. Jason's gun fell onto the porch, and the magazine separated from it. Will saw Wade pick up the handgun, but he did not see what Wade did with it.

Two detectives from the Omaha Police Department were patrolling nearby when they heard multiple gunshots from what they believed was a high-caliber rifle at 10:56 p.m. They arrived at Patricia's house less than 1 minute later. A group of people on the porch were yelling and screaming that someone had been shot. The officers saw Wade run across the yard to the Windstar minivan. The officers commanded him to stop, but Wade tried to back the minivan out of the driveway. Eventually, Wade stopped the minivan, exited, and was handcuffed. Wade had blood on his forehead and hands, but he did not appear to be injured. Wade told one of the officers that someone had tossed a handgun directly across the street. Jason's handgun was later located by law enforcement across the street. The magazine from Jason's handgun was located on the porch of Patricia's house, along with nine .45-caliber live rounds, which fit inside the magazine.

Jason was transported by ambulance to an Omaha hospital, where he was treated for a gunshot wound. The bullet entered between Jason's upper right shoulder and upper right triceps and exited through the right side of his chest. Jason was hospitalized for approximately 2 weeks and underwent three surgeries. He subsequently underwent physical therapy to return his right arm to full function.

The autopsy report of Adrian's body documented 14 bullet wounds, including both entrance and exit wounds. Two bullets and several bullet fragments were found in Adrian's abdominal area. The cause of death was determined to be a gunshot wound to the chest.

The Ford Windstar minivan driven by Wade on the night of the shooting was owned by Watt's sister. A search of the minivan found an empty black rifle case on the front passenger seat. Although no firearms were located in the minivan, two rifle magazines were found in a side compartment of the rifle

case. The magazines contained 7.62-mm rounds. However, the firearm used in the shooting was never located.

At the scene, five spent cartridge cases were found, and it was determined they had been fired by the same weapon. Five different firearms were identified as being capable of firing the cartridges: a B West AK-47S; a Chinese SKS; an Arsenal SLR 95; a Czechoslovakian VZ-58; and a Russian RPD. The spent cartridge cases were 7.62 × 39-mm, which is a rifle cartridge. A plastic bag located in Lewis' bedroom closet contained live rounds of that same caliber of ammunition. Lewis testified that the ammunition belonged to Wade and that she was not aware it was in her closet. The bullets and fragments removed from Adrian's body at the autopsy were determined to be either 7.62-mm or .30/30-caliber bullets.

A warrant was issued for Watt's arrest in November 2010, but law enforcement was unable to locate him in Omaha. He was apprehended in Glendale, Arizona, in December 2010, based on a Crimestoppers tip.

Two witnesses testified for Watt. His wife testified that Watt was with her the entire evening of November 10, 2010. She said he dozed off on the couch at about 11:30 p.m. She said she received a telephone call at 3 or 4 a.m. telling her that Adrian had been shot.

Jaquita Shields lived with the Watts. She testified that she worked on November 10, 2010, from 2 to 10 p.m. and arrived home at about 10:20 p.m. Shields then put together a computer desk, completing the task at about 11:15 or 11:30 p.m. She stated that Watt was present during this entire time. She went to her room at around midnight.

The State offered a rebuttal witness who worked as a customer support supervisor for Shields' employer. The witness testified that Shields worked for the company from November 4 to 11, 2010. Shields' regular schedule was the second shift, from 3:30 p.m. to midnight. The company's time records for November 10 show that Shields worked from 3:24 to 11:50 p.m.

A jury convicted Watt of first degree murder, first degree assault, and two counts of use of a deadly weapon. The court

found Watt guilty of possession of a deadly weapon by a prohibited person. Watt was sentenced to a term of life imprisonment for first degree murder and to prison terms of 15 to 30 years for each of the other convictions, for a total of life plus 60 to 120 years in prison. All sentences were ordered to be served consecutively. Watt was given credit for 448 days' time served "against the sentence imposed."

## III. ASSIGNMENTS OF ERROR

Watt assigns the following errors: (1) There was insufficient evidence to convict him, (2) the district court erred by incorrectly instructing the jury, (3) the State engaged in prosecutorial misconduct by arguing facts not in evidence and by intimidating a witness into changing her testimony, (4) he received ineffective assistance of counsel at trial, (5) the district court erred in finding that exhibit 2 was sufficient to establish a prior felony conviction, and (6) the district court abused its discretion in sentencing.

## IV. STANDARD OF REVIEW

[1,2] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[2]

[3,4] Whether jury instructions given by a trial court are correct is a question of law.[3] When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[4]

---

[1] *State v. Reinpold*, 284 Neb. 950, 824 N.W.2d 713 (2013).

[2] *Id.*

[3] *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012).

[4] *Id.*

[5] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[5]

## V. ANALYSIS

### 1. Sufficiency of Evidence

#### (a) Murder and Assault Convictions

Watt argues that the evidence was insufficient to support his convictions for first degree murder and first degree assault, and the corresponding convictions for use of a deadly weapon to commit a felony. Because the convictions on the weapons charges are necessarily linked to the murder and assault convictions, we consider only the elements of the latter offenses in our analysis of the sufficiency of the evidence.

Pursuant to Neb. Rev. Stat. § 28-303 (Reissue 2008), a person commits murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice. Thus, the three elements which the State must prove beyond a reasonable doubt to obtain a conviction for first degree murder are that the defendant (1) killed another person, (2) did so purposely, and (3) did so with deliberate and premeditated malice.[6] A person commits the offense of assault in the first degree if he intentionally or knowingly causes serious bodily harm to another person.[7]

Watt challenges the sufficiency of the evidence on two grounds. First, he argues that the evidence was insufficient to prove that he fired the shots which killed Adrian and seriously injured Jason. He argues that Will, the only witness who testified that he saw Watt fire the rifle, gave differing statements to the police and also testified that he had consumed alcohol and had "smoked a PCP stick" prior to arriving at the house. Watt argues that "given [Will's] criminal record, prior statements and relationship to the victims," he

---

[5] *State v. Ramirez*, 284 Neb. 697, 823 N.W.2d 193 (2012).

[6] *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 158, 184 L. Ed. 2d 78.

[7] Neb. Rev. Stat. § 28-308(1) (Cum. Supp. 2012).

"was simply not credible."[8] Watt also claims that McCraney, who testified that he saw Watt holding the rifle just before the shots were fired, was not credible because he provided inconsistent statements.

Watt's argument ignores our standard of review, which does not permit us to resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[9] The credibility of Will, McCraney, or any other witness was a question for the jury, which heard and observed the witnesses as they testified. Any conflicts in the evidence or questions concerning the credibility of witnesses were for the jury as finder of fact to resolve.[10] We conclude that there was sufficient evidence upon which the jury could have reasonably concluded that Watt was the shooter.

Watt also contends that there was insufficient evidence of premeditation to support his first degree murder conviction. He argues that at most, the evidence supports a conviction for sudden quarrel manslaughter because he was attempting to stop the fight between Adrian and Wade. This manslaughter argument is problematic for two reasons. First, Watt did not assert at trial the affirmative defense of justifiable use of force for the protection of others.[11] Rather, his defense was premised on the contention that he was not present at the scene of the shooting and therefore could not have committed the crimes. Second, at least one court has held that evidence of a sudden quarrel between the victim and a third party will not support a conviction of voluntary manslaughter and that the defendant's intentional killing of one of the parties to the quarrel constitutes the offense of murder, not manslaughter.[12] But ultimately, we need not decide whether on this record a jury could have reasonably convicted Watt of sudden quarrel manslaughter. This is so because there is evidence from which a rational trier

───────────

[8] Brief for appellant at 28.

[9] *State v. Reinpold, supra* note 1.

[10] *State v. Hudson*, 279 Neb. 6, 775 N.W.2d 429 (2009).

[11] See Neb. Rev. Stat. §§ 28-1410 and 28-1416 (Reissue 2008).

[12] *State v. Harris*, 27 Kan. App. 2d 41, 998 P.2d 524 (2000).

of fact could have found each of the elements of first degree murder beyond a reasonable doubt.

[6] With respect to the element of "deliberate and premeditated malice," we have stated:

> "Deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act. . . . The term 'premeditated' means to have formed a design to commit an act before it is done. . . . One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. . . . No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. . . . A question of premeditation is for the jury to decide."[13]

As discussed above, there is evidence from which a trier of fact could have reasonably concluded that Watt was the person who fired the fatal shots. And the act of shooting an individual in the manner described by the witnesses in this case is inherently a deliberate act.[14] Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death.[15]

There is also evidence which supports a reasonable inference that Watt planned his actions and considered their consequences before pulling the trigger. McCraney testified that before the fight began, Watt was seated in the SUV, which was parked in the driveway on the west edge of Patricia's front yard. When the fight started, McCraney observed Watt exit the SUV, pull the hood of his sweatshirt over his head, and walk across the property to where Wade had parked the Windstar

---

[13] *State v. Nolan, supra* note 6, 283 Neb. at 73-74, 807 N.W.2d at 541 (quoting *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010)).

[14] See *id.*

[15] *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006); *State v. Gunther*, 271 Neb. 874, 716 N.W.2d 691 (2006).

minivan in the driveway adjacent to the east edge of the yard. McCraney testified that shortly thereafter, he observed Watt holding an assault rifle with two hands. From the fact that an empty rifle case and ammunition of the same caliber used in the shooting were subsequently found in the minivan, a trier of fact could reasonably infer that Watt left the SUV and walked to the minivan for the purpose of retrieving the weapon used in the shooting and that he, in fact, did so. Based upon McCraney's testimony that shots rang out immediately after he observed Watt holding the weapon and Will's testimony that he observed Watt standing in the front yard firing a rifle at the persons on the porch, a trier of fact could reasonably infer that Watt acted on his previously formed intent to deliberately use a deadly weapon in a manner reasonably likely to cause death. Thus, viewing the evidence in a light most favorable to the prosecution, as our standard of review requires, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Watt killed purposely and with deliberate and premeditated malice. The evidence is therefore sufficient to support the first degree murder conviction.

### (b) Prior Felony Conviction

Watt waived his right to have the jury consider the charge of possession of a deadly weapon by a felon, and the district court found him guilty of this charge at the conclusion of trial. On appeal, Watt challenges the sufficiency of the evidence to support this conviction.

[7] The offense is defined by Neb. Rev. Stat. § 28-1206(1) (Cum. Supp. 2012), which provides: "Any person who possesses a firearm . . . and who has previously been convicted of a felony . . . commits the offense of possession of a deadly weapon by a prohibited person." Before a prior felony conviction can be used to prove that a defendant is a felon in a felon in possession case, the State must prove either that the prior felony conviction was counseled or that counsel was waived.[16] Watt argues on appeal that the State failed to meet its burden of proving a prior felony conviction.

---

16 *State v. Portsche*, 258 Neb. 926, 606 N.W.2d 794 (2000).

At trial, the State offered exhibit 2, a certified copy of a judgment entered by the U.S. District Court for the District of Nebraska in 2006, finding Watt guilty of the offense of being a felon in possession of a firearm as defined in 18 U.S.C. § 922(g) (2006). The judgment listed the name of Watt's attorney in that case. When exhibit 2 was offered at trial in the instant case for purposes of the felon in possession charge, Watt's trial counsel reviewed it and stated: "Judge, I have nothing foundationally to object to. And I note that [Watt] was represented by [counsel] during the process. I have no objection." The exhibit was received.

On appeal, Watt claims that receipt of this exhibit constituted plain error and that it was insufficient to establish a prior felony conviction. Specifically, he contends that exhibit 2 "did not contain documentation that Watt was represented by counsel or waived his right to counsel at the time of the conviction" but "only established that at the time that the judgment was entered, August 11, 2006, he had an attorney of record."[17]

[8] A conviction in a bench trial of a criminal case is sustained if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.[18] Applying that standard of review, we conclude that exhibit 2 was sufficient to establish that Watt was counseled at the time of his prior felony conviction. And as noted above, there was evidence in this case that Watt possessed the weapon used in the shooting which is the subject of this case. The evidence was therefore sufficient to support Watt's conviction on the charge of being a felon in possession of a deadly weapon.

## 2. Jury Instructions

### (a) Instruction No. 5

[9,10] Jury instruction No. 5 given by the trial court was a step instruction which generally followed the format of

---

[17] Brief for appellant at 44.

[18] *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010); *State v. Thompson*, 278 Neb. 320, 770 N.W.2d 598 (2009).

NJI2d Crim. 3.1. On appeal, Watt argues that the district court erred by including language in instruction No. 5 which differed from that of NJI2d Crim. 3.1 and altered the meaning of the instruction. As given by the court, the instruction began, "Under Count I of the Information, depending on evidence which you find that the State has proved beyond a reasonable doubt, you may find . . . Watt . . . Guilty of . . . ." The pattern jury instruction begins, "Depending on the evidence, you may return one of several possible verdicts."[19] Watt argues that the language added by the trial court was unduly suggestive and could have been interpreted by the jury to mean that the State had in fact conclusively proved the crimes beyond a reasonable doubt. But Watt did not make this objection at trial, and the issue has therefore not been preserved for appeal. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.[20] Although Watt objected to the instruction on another basis, this does not preserve it for our review, because on appeal, a defendant may not assert a different ground for his objection than was offered at trial.[21]

[11] We find no plain error by virtue of the slight discrepancy in the language of instruction No. 5 as given and NJI2d Crim. 3.1. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[22] Viewed in this light, the instruction as given was not prejudicial as it clearly instructed the jury that it was the jury's decision as to whether the State had met its burden to prove a crime beyond a reasonable doubt.

[12] Watt also contends on appeal that instruction No. 5 was improper because of the use of the word "must" instead of

---

[19] NJI2d Crim. 3.1.

[20] *State v. Reinpold, supra* note 1.

[21] See *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

[22] *State v. Kibbee, supra* note 3.

"may" in the section entitled "Effect of Findings." The court instructed the jury that it "must" consider the crimes separately, that it "must" decide if each element had been proved, and that it "must" proceed through the crimes in sequence until it reached its conclusion. Watt argues that the use of the word "must" exerted undue pressure on the jury to reach agreement. But again, he did not object to the instruction on this basis at trial. Thus, the issue has not been preserved on appeal and the only remaining question is whether the giving of the instruction constituted plain error.[23] It did not. The instruction was in conformity with NJI2d Crim. 3.1, which uses the term "must." And we have stated, "Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case."[24]

Watt also contends that instruction No. 5 did not adequately inform the jury that it could find him guilty of sudden quarrel manslaughter if it determined that he acted intentionally but under provocation of a sudden quarrel. This argument is based upon our decision in *State v. Smith*,[25] which was filed 3 days after the verdicts in this case were returned. In *Smith*, we found error in the giving of a step instruction because the instruction required the jury to convict on second degree murder if it found the killing was intentional and did not permit the jury to consider the alternative possibility that the killing was intentional but provoked by a sudden quarrel. The step instruction in this case is similar to that in *Smith*.

We considered a post-*Smith* challenge to jury instructions in *State v. Alarcon-Chavez*,[26] an appeal from a first degree murder conviction in which the step instruction was similar to that found deficient in *Smith*. There, we concluded that the instruction could not have been prejudicial because the jury convicted the defendant of first degree murder and, therefore, the jury did

[23] See *State v. Reinpold, supra* note 1.

[24] *State v. Freemont*, 284 Neb. 179, 202, 817 N.W.2d 277, 297 (2012).

[25] *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011).

[26] *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012).

not reach the differences between second degree murder and sudden quarrel manslaughter which we addressed in *Smith*. The same reasoning applies here. Thus, any error with respect to the manslaughter instruction was harmless beyond a reasonable doubt and could not constitute plain error.

### (b) Instruction No. 6

Watt also objects to the inclusion of manslaughter in instruction No. 6, which outlined the elements necessary to find him guilty of use of a deadly weapon to commit a felony. The instruction stated that the material elements were:

> 1. That on or about November 10, 2010, in Douglas County, Nebraska, [Watt] did commit Murder in the First Degree, Murder in the Second Degree, or Manslaughter which is the subject of Count I of the Information;
> 2. That in the commission of said Murder in the First Degree, Murder in the Second Degree, or Manslaughter, a deadly weapon, to wit: a firearm, was used; and
> 3. That such use of a deadly weapon was intentional.

Watt's objection to the inclusion of manslaughter in this instruction was overruled by the trial court.

In arguing that the instruction was in error, Watt relies on *State v. Sepulveda*,[27] in which we noted that "[w]hen the felony which serves as the basis of the use of a weapon charge is an unintentional crime, the accused cannot be convicted of use of a firearm to commit a felony." Watt argues that it was improper to include manslaughter in the elements of this instruction when there was no option for the jury to find him guilty of intentional manslaughter.

Although Watt correctly asserts that a person cannot be convicted of use of a deadly weapon to commit a felony when the underlying felony is an unintentional crime, we find no reversible error in the instruction as given here. As we have noted, when the jury convicted Watt of first degree murder, it determined that he committed the crime intentionally. The jury then ceased its deliberations and did not consider manslaughter. The conviction for use of a deadly weapon to commit a

---

[27] *State v. Sepulveda*, 278 Neb. 972, 975, 775 N.W.2d 40, 44 (2009).

felony was based on the first degree murder conviction. The inclusion of manslaughter in the instruction could not have prejudiced Watt.

### 3. Prosecutorial Misconduct

Watt argues that the prosecutor engaged in misconduct by intimidating a witness into changing her testimony and by arguing facts not in evidence during closing argument.

### (a) Alleged Witness Intimidation

Lewis testified as a witness for the prosecution. During her direct examination, she testified that she saw Watt arrive at the house in an SUV before the fistfight broke out and that he was attempting "to calm everything down" and was "basically being a peacemaker." She also testified that after the fistfight began, an armed man dressed in black who no one knew "jumped in" and tried to shoot Wade. After a break in the trial, Lewis' direct examination resumed and the State was given leave to treat her as a hostile witness over Watt's objection. Lewis then admitted that she had lied about the unknown gunman dressed in black because she was fearful for her safety and that of her daughter. She testified that she saw the SUV in which Watt had arrived as it left the scene after the shooting. Lewis did not identify Watt as the person who fired the shots.

On appeal, Watt claims that he observed a representative of the State "scolding Lewis in the hallway during the break" in the trial and that Lewis was "crying as she was being scolded."[28] He acknowledges that no record was made of this encounter, but he contends that the State intimidated Lewis into changing her testimony and thereby committed prosecutorial misconduct.

[13,14] The absence of a record regarding the claimed witness intimidation precludes our consideration of the issue. Failure to make a timely objection waives the right to assert prejudicial error on appeal.[29] When an issue is raised for the

---

[28] Brief for appellant at 37.

[29] *State v. Kibbee, supra* note 3; *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011).

first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.[30] Because the record is silent with respect to this claim of prosecutorial misconduct, we cannot determine whether prejudicial error occurred.

### (b) Closing Argument

Watt also argues that the prosecutor argued facts not in evidence during the rebuttal portion of closing argument and that this constituted misconduct warranting reversal. In an apparent reference to Wade, the prosecutor argued: "Because he called his buddy, [Watt], to come to that house in an SUV armed with his AK-47, and that when things got bad to open fire on the people on the porch." Again referring to Wade, the prosecutor argued that "he got with [Watt]. And in that exchange, that rifle that was in that case in [Wade's] car went to the SUV that [Watt] was driving." Watt argues that these statements were improper because although there was evidence that Wade was talking on his cellular telephone before Watt arrived at the scene, there was no proof that he was speaking with Watt.

[15-17] But Watt's trial counsel did not object to these statements during closing argument or move for a mistrial. In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument.[31] Thus, Watt has waived any complaint about prosecutorial misconduct during closing arguments, and we cannot consider the issue unless we find that it constitutes plain error. Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[32] But as we

---

[30] *Id.*

[31] *State v. Robinson, supra* note 13.

[32] *State v. Alarcon-Chavez, supra* note 26.

have noted, "'the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'"[33]

[18-21] Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper.[34] It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.[35] Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused.[36] A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.[37] Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[38] When a prosecutor's conduct was improper, this court considers the following factors in determining whether the conduct prejudiced the defendant's right to a fair trial: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.[39]

We find no plain error with respect to the two brief segments of the prosecutor's closing argument challenged on

---

[33] *Id.* at 336, 821 N.W.2d at 369 (quoting *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). See, also, *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds*, *State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[34] *State v. Alarcon-Chavez, supra* note 26.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

appeal. Although there is no direct evidence that Wade summoned Watt to the house where the shooting occurred, there was evidence that Wade was observed making a telephone call during a lull in his verbal altercation with Jason. When Watt subsequently arrived at the house, Wade's demeanor changed. Wade and Watt were friends, but others present at the house that evening did not know Watt or were only casually acquainted with him. Although Watt shook hands with Adrian when he arrived, there was no indication that Adrian had invited him to the house. From these facts, it is at least arguable that a reasonable inference could be drawn that Wade called Watt to the scene.

But even if the prosecutor's comments were improper, they were not so numerous or egregious as to constitute plain error. Watt argues that the prosecutor's statements improperly suggested that the murder was premeditated. But as we have discussed above, Watt's conduct *after* he arrived at the house was sufficient to establish that he acted with deliberate and premeditated malice in firing the fatal shots. The prosecutor's argument, whether proper or not, did not result in damage to the integrity, reputation, and fairness of the judicial process, or deprive Watt of a fair trial.

### 4. Ineffective Assistance
### of Counsel

[22] Watt was represented by different attorneys at trial and on direct appeal. Under Nebraska law, in order to raise the issue of ineffective assistance of trial counsel where appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review.[40] In this appeal, Watt asserts 12 ineffective assistance claims directed at his trial counsel.

[23,24] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record

---

[40] *State v. Young*, 279 Neb. 602, 780 N.W.2d 28 (2010).

is sufficient to adequately review the question.[41] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[42] We conclude that the record is sufficient to address some but not all of Watt's ineffective assistance claims.

[25-31] Certain general principles govern our consideration of those claims which we are able to reach. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[43] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.[44] To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area.[45] To show prejudice, the defendant must demonstrate reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[46] The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice.[47] Trial counsel is afforded due deference to formulate trial strategy and tactics.[48] When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel.[49] Deficient performance and prejudice can be addressed in either order.[50] If it is more appropriate to dispose of an

---

[41] *State v. Ramirez, supra* note 5.

[42] *Id.*

[43] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[44] *State v. Nolan, supra* note 6.

[45] *State v. Yos-Chiguil*, 281 Neb. 618, 798 N.W.2d 832 (2011).

[46] *Id.*

[47] *State v. Dunkin*, 283 Neb. 30, 807 N.W.2d 744 (2012).

[48] *State v. Timmens*, 282 Neb. 787, 805 N.W.2d 704 (2011).

[49] *Id.*

[50] *State v. Reinhart*, 283 Neb. 710, 811 N.W.2d 258 (2012).

ineffectiveness claim due to the lack of sufficient prejudice, that course should be followed.[51]

With these principles in mind, we turn to Watt's specific claims in the order that they are presented in his brief.

### (a) Failure to Make Record Regarding Lewis' Testimony

As noted, Watt alleged in his brief that he saw a representative of the State "scolding" Lewis during a break in her testimony and that she was "crying as she was being scolded."[52] In his first claim of ineffective assistance of counsel, Watt argues that his trial counsel was ineffective in failing to "Object to the State Intimidating . . . Lewis Into Changing her Testimony After a Break."[53] Watt contends that his counsel's failure to object or make a record of the State's conduct prejudiced him because Lewis was allowed to change her testimony and testified in a way that made it look like she was originally trying to protect Watt. We conclude that the record on direct appeal is insufficient for us to resolve this claim, and we therefore do not reach it.

### (b) Failure to Object to Prosecutor's Closing Argument

In his second claim, Watt contends that his trial counsel was ineffective in failing to "Move for a Mistrial or Object to the State Arguing Facts That Were not in Evidence During the Closing Argument."[54] This claim pertains to the portion of the prosecutor's closing argument discussed above in our analysis of Watt's prosecutorial misconduct claim. Because it was at least arguable that the inferences urged by the prosecutor's statements were reasonable, trial counsel may have chosen not to object as a matter of trial tactics and strategy. And even if that were not the case, we conclude that Watt was not

---

[51] See *State v. Moyer*, 271 Neb. 776, 715 N.W.2d 565 (2006).

[52] Brief for appellant at 37.

[53] *Id*. at 38.

[54] *Id*. at 39.

prejudiced by the absence of objections to those comments for the reasons set forth in our discussion above.

### (c) Failure to Depose State's Witnesses

In his third ineffectiveness claim, Watt contends that "trial counsel did not depose all of the witnesses prior to trial, and that the failure to do so prejudiced his defense."[55] We conclude that the record on direct appeal is insufficient for us to resolve this claim, and we therefore do not reach it.

### (d) Delay in Interviewing Witnesses

In his fourth claim, Watt contends that his trial counsel was ineffective in failing to interview his own witnesses until 10 days before trial and that the failure to speak to them sooner prejudiced his defense. We conclude that the record on direct appeal is insufficient to reach this claim.

### (e) Calling Shields as Defense Witness

In his fifth claim, Watt contends that his trial counsel provided ineffective assistance by calling Shields as an alibi witness to testify that Watt was with her at the time of the shooting. Shields' credibility was impeached when another witness testified that Shields was at work at the time of the shooting. Whether or not trial counsel performed deficiently in calling Shields, we conclude that even though her testimony was impeached at trial, there is no reasonable probability the outcome of the case would have been different had she not testified at all. Accordingly, Watt cannot establish prejudice under the second prong of the *Strickland* test.

### (f) Failure to Verify Shields' Employment Hours

In his sixth claim, Watt contends that his trial counsel was ineffective in failing to discover timesheets which would have verified the hours that Shields worked on the date of the crime. We conclude that Watt cannot establish prejudice resulting from this allegedly deficient performance because there is no reasonable probability the outcome of the trial would not have

---

[55] *Id.*

been different if counsel had discovered the timesheets and decided not to call Shields as a witness.

### (g) Failure to Raise Juror Misconduct

In his seventh claim, Watt contends that his trial counsel was ineffective in failing to move for a new trial based upon the fact that one of the jurors was having regular contact with a member of one of the victim's family during the trial. We conclude that the record on direct appeal is insufficient to reach this claim.

### (h) Failure to Call Witness to Dispute
### Communication Between Watt and Wade

In his eighth claim, Watt contends that his trial counsel was ineffective in failing to call witnesses who would have testified that there were no communications between Wade and Watt in the minutes and hours prior to the shooting. For the reasons discussed more fully above, we conclude that even if such witnesses had been called and so testified, there is no reasonable probability the outcome of the case would have been different. Accordingly, Watt cannot establish prejudice under the *Strickland* test.

### (i) Failure to Utilize Incorrect
### News Story in Defense

In his ninth claim, Watt contends that his trial counsel was ineffective in failing to confront witnesses regarding a news story which "incorrectly stated that . . . Watt was linked to the murder through a phone call."[56] We conclude that the record on direct appeal is insufficient to reach this claim.

### (j) Failure to Properly Address
### Lesser-Included Offenses

In his 10th claim, Watt contends that his trial counsel was ineffective in failing to address lesser-included offenses in his closing argument. As we have noted, Watt's defense was premised upon the assertion that he was not present at the time of the shootings, so a decision not to argue lesser-included offenses was clearly a matter of trial strategy. And because the

---

[56] *Id*. at 42.

jury found, based upon sufficient evidence, that Watt committed premeditated murder, trial counsel's decision not to argue for conviction of a lesser-included offense was not prejudicial. This claim is therefore without merit.

### (k) Failure to Impeach Jason or Object to His Testimony

In his 11th claim, Watt contends that he "has issues with the manner in which his trial counsel cross-examined" Jason in light of Jason's deposition testimony.[57] There is no merit to this cryptic allegation. Jason did not identify Watt as the person who fired the shots or testify that he observed Watt in possession of a firearm. We conclude that the cross-examination of Jason could not have prejudiced Watt.

### (l) Failure to Object to Exhibit 2

In his 12th and final claim, Watt contends that his trial counsel was ineffective in failing to object to exhibit 2, which was the record of his prior felony conviction. Because we conclude that this document was sufficient to establish that Watt had counsel on a prior conviction, we find this claim to be without merit.

### (m) Summary of Ineffective Assistance of Counsel Claims

For the reasons discussed, we conclude that the record on direct appeal is insufficient to permit us to consider Watt's first, third, fourth, seventh, and ninth claims of ineffective assistance of trial counsel. But the record is sufficient to permit us to consider each of his remaining claims, and we conclude that they are without merit.

### 5. SENTENCES

Finally, Watt asserts that the trial court abused its discretion in imposing excessive sentences. As a result of the jury's verdict, Watt was found guilty of first degree murder, a Class IA felony; first degree assault, a Class II felony; and two counts of use of a deadly weapon, Class IC felonies. Also, the court found Watt guilty of possession of a deadly weapon by a prohibited

---

[57] *Id.* at 43.

person, which is a Class ID felony. He was sentenced to a term of life imprisonment for first degree murder, and to terms of 15 to 30 years for each of the other convictions, for a total prison term of life plus 60 to 120 years. All sentences were ordered to be served consecutively. Watt was given credit for 448 days' time served "against the sentence imposed."

[32,33] Pursuant to Neb. Rev. Stat. § 28-105 (Reissue 2008), a Class IA felony is punishable by life in prison, a Class II felony is punishable by a term of 1 to 50 years in prison, a Class IC felony is punishable by a term of 5 to 50 years in prison, and a Class ID felony is punishable by a term of 3 to 50 years in prison. All of Watt's sentences were within the statutory range. And as noted above, an appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[58] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[59] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[60]

Watt claims that the sentences were excessive because the shooting arose from an argument between Adrian and Wade and Adrian's actions toward Wade were violent and instigated the shooting. As noted earlier, Watt was not a party to the quarrel. Whether Adrian or Wade started the fight between the two of them is of no consequence to the sentences imposed on Watt for his crimes. The district court did not abuse its discretion in sentencing Watt.

[34,35] However, we find plain error in the allocation of credit for time served. All of Watt's sentences were ordered to

---

[58] *State v. Pereira*, 284 Neb. 982, 824 N.W.2d 706 (2013).

[59] *Id*.

[60] *Id*.

be served consecutively, including the life sentence. Watt was given credit for 448 days' time served "against the sentence imposed." When a defendant is sentenced to life imprisonment for first degree murder, the defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence.[61] A sentencing judge must separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled.[62] Watt is entitled to receive credit for 448 days served, but the credit should be applied against the sentence for first degree assault rather than against the sentence for first degree murder. We therefore modify Watt's sentences by ordering that the credit for time served be applied against the sentence for first degree assault.

## VI. CONCLUSION

For the reasons discussed, we conclude that the evidence was sufficient to support Watt's convictions, that there was no prejudicial error in the jury instructions, and that there was no prosecutorial misconduct amounting to plain error. We also conclude that seven of Watt's claims of ineffective assistance of counsel are without merit and that the record on direct appeal is insufficient to permit us to consider the other five claims. Finally, we conclude that the district court did not abuse its discretion in imposing sentences on each of the convictions. However, we conclude that the district court incorrectly granted Watt credit for time served against his life sentence. We therefore modify the credit for time served by applying it to the sentence for first degree assault. In all other respects, we affirm the judgment of the district court.

AFFIRMED AS MODIFIED.

HEAVICAN, C.J., and CASSEL, J., not participating.

---

[61] *State v. Sing*, 275 Neb. 391, 746 N.W.2d 690 (2008).

[62] *Id.*