State of Nebraska, appellee, v.
Nicholas J. Ely, appellant.
___ N.W.2d ___

Filed January 3, 2014.    No. S-12-1228.

1. **Criminal Law: Convictions: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Evidence.** Determining the relevancy of evidence is a matter entrusted to the discretion of the trial court.

4. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403 and 404(2), Neb. Rev. Stat. §§ 27-403 (Reissue 2008) and 27-404(2) (Cum. Supp. 2012), and the trial court's decision will not be reversed on appeal absent an abuse of discretion.

5. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.

6. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

7. **Homicide: Intent: Presumptions.** The critical difference between felony murder and premeditated first degree murder is that the underlying felony takes the place of the intent to kill, or premeditated malice, and the purpose to kill is conclusively presumed from the criminal intent required for the underlying felony.

8. **Homicide: Intent.** A specific intent to kill is not required to constitute felony murder, only the intent to do the act which constitutes the felony in question.

9. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

10. **Evidence: Words and Phrases.** Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

11. **Homicide: Sentences.** When a defendant is sentenced to life imprisonment for first degree murder, the defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and

minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence.

12. **Sentences.** A sentencing judge must separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled.

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed as modified.

Mary C. Gryva, of Frank & Gryva, P.C., L.L.O., and Alan G. Stoler, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.

Nicholas J. Ely was convicted by a jury of first degree murder and use of a deadly weapon to commit a felony. He was sentenced to life in prison on the murder conviction and to a consecutive prison term of 5 to 5 years on the weapon conviction. This is his direct appeal, which we hear pursuant to Neb. Rev. Stat. § 24-1106(1) (Reissue 2008). We find no error and therefore affirm.

## FACTS

Around noon on July 6, 2011, a group of friends gathered at Ely's home. The group consisted of Ely, Marqus Patton, Ryan Elseman, and Emily G. Emily was 15 or 16 years old.

The group decided to obtain some marijuana and then go swimming at Patton's residence. Ely called Drake Northrop and asked him for a ride. Northrop picked up Ely, Emily, Patton, and Elseman, and Ely told Northrop they wanted to get some marijuana. Emily had previously purchased marijuana from Kristopher Winters, and she suggested they could obtain it from him. Emily directed Northrop to Winters' house.

En route to Winters' house, Northrop heard Elseman, Emily, and Ely discuss "going to go hit a lick," which is a street term for committing a robbery. Northrop agreed to take part. The three people in the back seat, Ely, Elseman, and Emily, said

they thought it would be an "easy lick" because Winters would not fight back.

Northrop parked near Winters' house, and everyone walked to the house. Initially, they planned to kick in the door, but because it was daylight, Emily said she would get them into the house in another manner. Northrop, Ely, Elseman, and Patton returned to the vehicle to wait for Emily to gain entry. The only objection made by anyone was Northrop, who suggested they should return when it was darker, but Patton and Ely said they should proceed.

Eric Brusha, a friend of Winters, arrived at Winters' house around noon and found Emily waiting in the driveway. Brusha did not know Emily. Brusha telephoned Winters to tell him Brusha was outside. Winters let Brusha into the house, and Emily followed him. Winters asked Emily what she wanted to purchase, and because Brusha knew Winters was a marijuana dealer, Brusha did not think the conversation was unusual.

Within 5 minutes, Emily sent a text message to Elseman informing him that she was inside Winters' house, that there were two other people there, and that the doors were unlocked. Northrop, Ely, Elseman, and Patton then went to Winters' house. They entered the basement of the house through a garage door. Elseman and Patton displayed weapons. Elseman entered first, followed by Patton, Ely, and then Northrop. Brusha did not recognize any of them as they entered, but he noticed that two of them were carrying black revolvers.

When Northrop, Ely, Elseman, and Patton entered, Winters and Brusha stood up. Elseman pointed a gun at Winters and said "you know what it is." Winters rushed at Elseman. A struggle ensued. During the struggle, Patton hit Winters in the head with the butt of a handgun, causing Winters to stumble backward. Winters then grabbed a chair and pushed Patton into a wall with it. Patton told Elseman to shoot Winters, and he did so, causing Winters to fall onto the steps leading upstairs. Winters then grabbed a stool or similar object and was approaching his assailants when he was shot a second time.

Winters' mother, Kellie Winters, was upstairs and heard a sound she thought was Winters' banging on the furnace, so

she went to the top of the stairs leading to the basement and called out to him. Kellie then went down the stairs where she found Winters holding his neck and Brusha yelling that Winters was hurt. Kellie ran outside and saw three males running away. She also saw a "young small girl," whom she did not recognize, standing in the driveway. This person was later determined to be Emily. Kellie yelled at Emily for not calling the 911 emergency dispatch service, and then Kellie struck Emily, knocking her down. Kellie then returned to the basement of the home where she found Winters, who was bleeding. Winters died before help arrived.

Northrop, Ely, Elseman, and Patton ran from the house to their vehicle immediately after the shooting. Emily left the area on foot. While fleeing, she received a text message from Elseman telling her to go to a nearby restaurant where Nicholas Palma would pick her up.

Brusha stayed at Winters' home and talked to the police. He then agreed to go to police headquarters for an interview and rode there with an officer. While riding with the officer, Brusha saw Emily walking on the street, and he identified her as the female who was in Winters' house at the time of the shooting. Police then apprehended Emily.

Meanwhile, Northrop dropped off Ely, Elseman, and Patton at Patton's residence. Patton told the others that he had been grazed by a bullet. When Palma could not find Emily, he called Ely, who told Palma to come to Patton's residence. Ely told Palma that they had tried to commit a robbery, but that things went wrong and a man was shot in the neck. Some days later, Ely called Palma and said he was leaving for Sioux City, Iowa. On July 11, 2011, Ely called Palma and asked him to pick him up in Sioux City and drive him back to Omaha, which Palma did.

Ely contacted two friends in Sioux City on July 9, 2011. Jacy Steiner said Ely called and said he was in town and needed to talk to someone because a robbery "went bad" in Omaha. Steiner met with Ely, and Ely said Emily had gone to the house to ask to use the telephone, and as Winters answered the door, people ran in, Winters fought back, and "somebody got shot." Ely told Steiner he had been in the vehicle, but he

did not say if he had gone into the house. Another friend of Ely's, Jacob Wilde, testified that he also met Ely in Sioux City on July 9. Ely told Wilde that he was in some trouble because he and some friends had gone into a house to rob someone, someone yelled "shoot," a shot went off, and then they all ran. Ely told Wilde that a girl had set up the robbery and that the person they were trying to rob was shot because he had put up a fight.

On the day before the robbery, a text message was sent from Ely's cell phone indicating that the sender was "'broke'" and had bills to pay. The message further stated, "'I ain't trying to go to prison for robbing but I feel like there ain't many other choices.'" Later the same day, another text message sent from Ely's cell phone stated: "'Wsup wita lick bro.'" A subsequent text in the same conversation, sent from Ely's cell phone, indicated that the sender needed money. And a text message from the same cell phone sent on the day of the homicide indicated that it was from "'Lunny,'" which was Ely's nickname, and that he was with Elseman, Emily, and two other persons.

An autopsy disclosed that one bullet went through Winters' neck, hitting the carotid artery on the right side. The pathologist who performed the autopsy testified that the cause of Winters' death was a gunshot wound to the neck which partially severed the carotid artery and led to a fatal hemorrhage.

## ASSIGNMENTS OF ERROR

Ely assigns three errors. They are, restated, (1) that the evidence was insufficient to sustain the guilty verdicts, (2) that the district court erred in sustaining the State's motion in limine and excluding evidence of prior illegal conduct by Emily, and (3) that the district court erred in giving a flight instruction to the jury.

## STANDARD OF REVIEW

[1] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of

witnesses, or reweigh the evidence; such matters are for the finder of fact.[1] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

[2-4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[3] Determining the relevancy of evidence is a matter entrusted to the discretion of the trial court.[4] Likewise, it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403 and 404(2), Neb. Rev. Stat. §§ 27-403 (Reissue 2008) and 27-404(2) (Cum. Supp. 2012), and the trial court's decision will not be reversed on appeal absent an abuse of discretion.[5]

[5,6] Whether jury instructions given by a trial court are correct is a question of law.[6] When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[7]

## ANALYSIS

### Sufficiency of Evidence

[7,8] The State prosecuted Ely under the theory of murder in the first degree, commonly known as felony murder. It is defined by statute as the killing of another "in the perpetration

---

[1] *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013).

[2] *Id*.

[3] *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013).

[4] *State v. Burton*, 282 Neb. 135, 802 N.W.2d 127 (2011).

[5] *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013); *State v. Payne-McCoy*, 284 Neb. 302, 818 N.W.2d 608 (2012).

[6] *State v. Valverde, supra* note 3.

[7] *Id*.

of or attempt to perpetrate any sexual assault in the first degree, arson, robbery, kidnapping, hijacking of any public or private means of transportation, or burglary."[8] The critical difference between felony murder and premeditated first degree murder is that the underlying felony takes the place of the intent to kill, or premeditated malice, and the purpose to kill is conclusively presumed from the criminal intent required for the underlying felony.[9] A specific intent to kill is not required to constitute felony murder, only the intent to do the act which constitutes the felony in question.[10]

It is undisputed that Winters was killed in the perpetration of a robbery and that Ely was present at all times during the robbery. But Ely argues on appeal that the evidence was insufficient to establish that he formed an intent to commit the robbery during which the killing occurred. Viewing the evidence in the light most favorable to the prosecution, as our standard of review requires,[11] we conclude that a rational trier of fact could have concluded beyond a reasonable doubt that Ely formed the intent to commit the robbery.

The text messages sent from Ely's cell phone the day before the homicide indicated the sender needed money and was considering robbery. Emily testified that while the group was on its way to Winters' house, they devised a plan to rob him. Northrop testified that he heard Ely say from the rear seat that they were "going to go hit a lick" and that Ely or one of the other rear seat passengers also said that the robbery would be easy because Winters would not fight back. Northrop also testified that when Emily signaled Elseman that she had entered Winters' house, he suggested that they should wait until dark before going in, but that Ely and Patton said they should go ahead. After the failed robbery attempt, Ely made statements to Palma and others indicating that he had

---

[8] Neb. Rev. Stat. § 28-303(2) (Reissue 2008).

[9] *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

[10] See *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006).

[11] See *State v. Eagle Bull*, *supra* note 1.

been involved in a robbery attempt which "went bad" because someone was shot.

From this evidence, a rational finder of fact could find beyond a reasonable doubt that Ely needed money and was contemplating robbery as a means of addressing this problem. A rational finder of fact could also conclude that en route to Winters' house with his companions, Ely was an active participant in the plan to "hit a lick," i.e., rob Winters during the purported drug transaction. Likewise, a finder of fact could conclude that Ely was an active and willing participant in the implementation of the plan which ultimately led to the fatal shooting. There is no evidence that Ely raised any objections to the robbery plan or attempted to extricate himself from its implementation by, for example, remaining in the car. Although Ely argues that the testimony of Emily and Northrop lacked credibility because they hoped for, but were not promised, leniency with respect to pending charges against them arising from the same incident, our standard of review precludes us from passing on the credibility of witnesses or reweighing the evidence.[12] Whatever the motive Emily and Northrop had for testifying, it was for the jury to determine their credibility. And we note that the jury was specifically instructed that because Emily and Northrop were claimed accomplices of Ely, their testimony should be examined closely "for any possible motive he or she might have to testify falsely." Accordingly, we conclude that the evidence was sufficient to support the verdict of guilty on the charge of felony murder.

[9] We note that while Ely's first assignment of error is worded broadly enough to challenge the sufficiency of the evidence to support his convictions on both the murder and weapons charges, he makes no argument specific to the latter. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[13] Because the sufficiency of the evidence to support Ely's conviction on the weapon charge is not preserved for our review, we do not address it.

---

[12] See *id*.

[13] *Id*.; *State v. McGhee*, 280 Neb. 558, 787 N.W.2d 700 (2010).

Exclusion of Evidence of Prior
Unlawful Conduct

Before trial, the State filed a motion in limine seeking to prevent Ely from adducing evidence that prior to July 6, 2011, Emily and Elseman had engaged in criminal conduct, specifically, robbing individuals who were selling marijuana. The State argued that the evidence would be improper character evidence in violation of § 27-404(1) and was not relevant under § 27-404(2). The State also asserted that the evidence did not comport with the statutory requirements for proving character evidence of a witness under Neb. Evid. R. 608, Neb. Rev. Stat. § 27-608 (Reissue 2008). Over Ely's objection, the district court sustained the motion. When Ely sought to elicit testimony from Emily at trial regarding prior illegal acts she had committed at the behest of Elseman, the court sustained the State's objection. We construe Ely's second assignment of error to encompass this ruling.

Ely argues on appeal, as he did below, that Emily's prior robberies were relevant and admissible under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2008), and § 27-404(2), because they were committed without his knowledge or involvement. He contends that Emily's prior unlawful conduct is relevant to motive, opportunity, and planning of the intended robbery of Winters, and that therefore, the evidence should have been admissible under § 27-404(2).

[10] We need not examine the admissibility of the proffered evidence under § 27-404(2), because we conclude that the fact that Emily and Elseman may have committed prior robberies without the knowledge or participation of Ely is irrelevant to any issue in this case. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[14] The fact that Ely was not involved in prior unlawful conduct has no bearing, one way or another, on the issue of whether he committed the crimes he was charged with in this case. The district court did not abuse its discretion in sustaining

---

[14] § 27-401.

the State's motion in limine and its objection to Ely's attempt to elicit testimony from Emily regarding her prior unlawful conduct.

## Flight Instruction

Lastly, Ely assigns error with respect to the following jury instruction given over his objection:

> You are instructed that the voluntary flight of a person immediately or soon after the occurrence of a crime is a circumstance, not sufficient of itself to establish guilt, but a circumstance nevertheless which the jury may consider in connection with all the other evidence in the case to aid you in determining the question of the guilt or innocence of such person.

He contends the instruction was prejudicial and prevented him from receiving a fair trial.

We first note that, in Ely's brief, while he objects to the entire instruction, he highlights certain language related to the timing of a defendant's voluntary flight. The record shows that the instruction given did not include that language. Nor does the record indicate that Ely objected to that specific language during the instruction conference.

We addressed the factual basis for a flight instruction in *State v. Pullens*,[15] stating:

> [F]or departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt.

In *Pullens*, the defendant declined to give police a detailed statement because he said he was drunk. Although he was taken to the police station for blood and DNA samples, he was not placed under arrest. Instead, the defendant was taken to a motel by a police officer, who said he would return in the morning to discuss the facts of the victim's death. But when the officer returned, the defendant was not in the motel. The

---

[15] *State v. Pullens*, 281 Neb. 828, 862, 800 N.W.2d 202, 230 (2011).

defendant admitted that he knew he was a suspect when he fled, but claimed he left the motel to try to talk with a lawyer before speaking further with the police. We found no error in the trial court's giving the jury a flight instruction.

The record reflects that at some point after July 6, 2011, Ely went to Sioux City. While there, Ely talked to two friends about a robbery and said he was in trouble because of a shooting. This evidence supports a reasonable inference that Ely had a consciousness of guilt and was attempting to avoid apprehension. It was for the jury to determine whether Ely's actions demonstrated his guilt or innocence. We find no error in the giving of a flight instruction based on this record.

## Credit for Time Served

[11,12] Finally, we find plain error in the allocation of credit for time served. Ely was sentenced to life in prison for the first degree murder conviction and to a period of 5 to 5 years in prison for the use of a deadly weapon conviction, to run consecutively to the life sentence. Ely was given credit for time served of 531 days against the sentence for first degree murder. When a defendant is sentenced to life imprisonment for first degree murder, the defendant is not entitled to credit for time served in custodial detention pending trial and sentence; however, when the defendant receives a sentence consecutive to the life sentence that has maximum and minimum terms, the defendant is entitled to receive credit for time served against the consecutive sentence.[16] A sentencing judge must separately determine, state, and grant the amount of credit on the defendant's sentence to which the defendant is entitled.[17]

Ely is entitled to receive credit for 531 days served, but the credit should be applied against the sentence for use of a deadly weapon rather than against the sentence for first degree murder. We therefore modify Ely's sentences by ordering that the credit for time served be applied against the sentence for use of a deadly weapon.

---

[16] *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[17] *Id*.

## CONCLUSION

For the reasons discussed, we find no merit in any of Ely's assignments of error. However, we conclude that the district court incorrectly granted Ely credit for time served against his life sentence. We therefore modify the credit for time served by applying it to the sentence for use of a deadly weapon. In all other respects, we affirm the judgment of the district court.

AFFIRMED AS MODIFIED.