IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. SCHOEMANN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
GENE F. SCHOEMANN, APPELLANT.

Filed February 25, 2014.    No. A-13-436.

Appeal from the District Court for Otoe County: RANDALL L. REHMEIER, Judge. Affirmed.

Michael Ziskey, Otoe County Public Defender, for appellant.

Jon Bruning, Attorney General, and Melissa R. Vincent for appellee.

INBODY, Chief Judge, and PIRTLE and RIEDMANN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Gene F. Schoemann appeals from a conviction for one count of third degree sexual assault of a child. Schoemann was tried and convicted by a jury in the district court for Otoe County. For the reasons that follow, we affirm.

## BACKGROUND

On August 1, 2012, Schoemann, a 71-year-old male, was charged by information in the district court for Otoe County with one count of third degree sexual assault of a child, a Class IIIA felony. The alleged victim in this case is D.J., a 12-year-old boy, who resided with his parents and siblings in Nebraska City. On August 6, Schoemann appeared before the district court and entered a plea of not guilty.

On January 25, 2013, the State filed a motion and notice of intent to present evidence pursuant to Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2012). The motion sought

permission to introduce evidence at trial regarding a prior incident involving Schoemann and the victim's brother, O.J., to prove intent.

A hearing on the motion was held on February 20, 2013. Counsel for both parties agreed to continue the hearing until the time of trial and further agreed not to mention the proposed rule 404 evidence to the jury before the district court rendered its decision.

On March 1, 2013, the State filed an amended motion and notice of intent to present evidence pursuant to rule 404. The motion alleged the incident involving O.J. was admissible to prove not only intent, but also motive, preparation, and plan.

Schoemann's jury trial began on March 5, 2013. The victim, D.J., and his father testified. On March 6, the district court heard the State's motion to present evidence pursuant to rule 404. D.J.'s younger brother, O.J., testified about an incident which occurred at Schoemann's residence. The court noted several similarities between the incidents involving D.J. and O.J., and found O.J.'s testimony was admissible for the limited purpose of proving intent, motive, and a common plan and allowed O.J. to testify over Schoemann's objection. The court instructed the jury that O.J.'s testimony was being offered for a limited purpose and should be considered only on the issues of intent, motive, and a common plan.

D.J. and O.J.'s mother first met Schoemann at Wal-Mart shortly after the family moved to Nebraska City. She testified that Schoemann approached her and said her children were well-behaved in the store. After that time, she saw Schoemann periodically, because he worked as a greeter at Wal-Mart. She was usually accompanied by several of her eight children, including D.J. and O.J., and Schoemann sometimes gave them candy. Schoemann asked for the children's' birthdates so he could purchase gifts for them.

In February 2011, D.J.'s mother told Schoemann that D.J. was having trouble in math. Schoemann stated he was a former math teacher, and he offered to tutor D.J.

D.J. testified that he received math tutoring from Schoemann. Initially, they met every Thursday at Burger King in Nebraska City, then after a few weeks, they met at Runza in Nebraska City, because Burger King was too noisy.

On or about May 15, 2012, Schoemann presented D.J. with a handwritten contract, which read:

I [D.J.] want Gene Schoemann to be my adopted grandfather on this day May 15th 2012. I promise to obey and do what he says so I will become a better man in the future. I promise to love him as a grandfather and listen to what he has to say. Although we may not agree, I will respect his opinion. This is a signed agreement between him and me.

Schoemann read the contract to D.J. and asked him to sign it. D.J. testified that he felt like he had to sign it and that he did so because he knew it was "not real," or legally binding. After their tutoring session, Schoemann took D.J. to his house in Nehawka to pick up a lawnmower and some books.

Upon arrival, Schoemann gave D.J. a tour of the house. D.J. testified Schoemann stopped D.J. by the bathroom and offered him money to walk into the bedroom. D.J. testified Schoemann stated the amount of money D.J. would be paid would depend on the amount of clothing D.J. was willing to remove. He would receive $5 if he entered the bedroom fully clothed, $10 if he wore only his underwear, and $20 if he was naked. D.J. stated he was in Schoemann's bathroom

with the door open when he removed his shirt and pants and left his boxer shorts on. D.J. stated Schoemann was outside of the bathroom door and told D.J. to lie down on a towel on the bed. When D.J. laid on his back on the towel, Schoemann pulled up the towel, pointed to a white spot, and said, "This is sperm, do you know what this is?" D.J. said Schoemann started talking about "sex stuff" and said if D.J. ever had sex before he turned 18, Schoemann would personally rip D.J.'s penis off. D.J. testified that he told Schoemann that was none of his business, and Schoemann said it was his business because D.J. had signed the contract making Schoemann his adopted grandfather. D.J. testified this incident made D.J. feel "weird and creepy."

D.J. got dressed and went into the living room where Schoemann was seated in an armchair. Schoemann asked D.J. to sit on his lap and kiss him on the cheek. Schoemann also gave D.J. $10 and told him he could spend it on his upcoming vacation. After discussing some model cars, a pocketknife, and a watch in the living room, D.J. helped Schoemann load some books and a weight set into Schoemann's car.

Schoemann drove D.J. to his home in Nebraska City, and Schoemann asked D.J. how he felt about what had happened. D.J. said "not very good." Upon arrival at the Nebraska City home, they unloaded the weight set in Schoemann's bedroom. Schoemann, a former coach, had advised D.J. that he could help D.J. get stronger by lifting weights. Schoemann instructed D.J. to remove his shirt and pants so Schoemann could watch his muscles. Schoemann was sitting on the bed, and D.J. stood in front of him. D.J. did five sets of 10 curls, resting for 2 to 3 minutes between each set. During each rest period, Schoemann asked D.J. to lie down on the bed to relax his muscles. D.J. testified that each time he laid down, Schoemann checked D.J.'s heartbeat, first on his chest, then lower, on D.J.'s thigh, near his "private part." During one set, Schoemann told D.J. to face away from him so he could watch the back of D.J.'s legs. After the final set, D.J. again laid down. D.J. testified Schoemann said he had a "cute butt" and instructed D.J. to roll over onto his stomach. D.J. testified Schoemann placed his hand underneath the loose leg opening of D.J.'s boxer shorts, squeezing each buttock, one at a time.

Schoemann then told D.J. to get dressed, and the two went outside to practice golf in the backyard. Although D.J. did not immediately report this incident to his parents, he stated it made him "uncomfortable." Shortly after the incident, D.J.'s family went on vacation. D.J.'s mother testified that she noticed a change in D.J.'s personality on the trip. She said he was more reserved and quiet than normal. She said he asked her a few times, "Mom, do you love me?" and "Will you love me no matter what?" She testified D.J. talked to her a few days after their return from the vacation about the incident at Schoemann's home.

D.J.'s father testified that D.J. started having more problems in school after the incident. D.J.'s father noted D.J. was "getting kicked out of after-school clubs, being disruptive with teachers, stuff of that nature." He stated that he found out about D.J.'s allegations related to Schoemann after D.J. talked to his mother when the family returned from their vacation.

The State offered testimony of D.J.'s younger brother, O.J., involving a similar incident which occurred after O.J. received tutoring from Schoemann. O.J. testified that Schoemann began tutoring him at Runza in Nebraska City. While at Runza, Schoemann presented O.J. with a piece of paper containing an agreement for O.J. and Schoemann to both sign.

The agreement read:

> I [O.J.] do want Gene Schoemann to be my adopted grandfather on this day May 8, 2012, I promise to obey and do what he says so I will become a better man in the future. I promise to love him as a grandfather and listen to what he has to say. Although we may not agree I will respect what he says. This is a signed agreement between him and me.

After a tutoring session, Schoemann drove O.J. to his home in Nebraska City for the first time, to teach O.J. how to play golf. O.J. testified that Schoemann put his hand on O.J.'s knee when they drove to the house. When they reached the house, Schoemann gave O.J. candy in his bedroom and gave him clothing, which O.J. was supposed to wear to play golf. O.J. asked Schoemann if he could change in the bathroom. O.J. testified that Schoemann was sitting on the bed in the bedroom and that he responded, "Nobody is going to bite." O.J. then changed his clothes in the bedroom. Schoemann took O.J. outside to play golf and put his arms around O.J. to show him how to swing. After the golf lesson, O.J. changed back into his own clothes in Schoemann's bedroom, while Schoemann sat on the bed, and Schoemann told him stories while they sat on the bed together. O.J. testified that while on the bed, Schoemann put his arm around O.J. O.J. also testified Schoemann patted him "on the butt." O.J. testified that Schoemann told him he was getting old and needed lots of hugs and kisses.

O.J. testified he went to Schoemann's house twice. The second time, they practiced golfing, and O.J. again changed into the clothing Schoemann provided. He also helped Schoemann to move a couch.

O.J. testified that he did not go to Schoemann's other house, but Schoemann talked to him about it. He told O.J. that he had magazines of naked women and that if O.J. ever looked at them, Schoemann would give him "boom booms," or spankings.

Schoemann testified that he was in the teaching profession for 35 years with degrees in philosophy, math, psychology, history, social studies, and religion. During his career, he was a junior high football coach, a high school track coach, and a middle school basketball coach. He retired from teaching in 2003 and went back to teaching for a brief period in 2005. He began working for Wal-Mart in December 2006, helping to open the store, and then heading the meat department. Approximately a year later, he became a greeter for Wal-Mart. He was suspended from his position as a greeter after D.J.'s parents reported the alleged incident with D.J.

Schoemann testified that while at Wal-Mart, he gave gifts of candy and trinkets to D.J. and his siblings and they were appreciative of them. Schoemann testified that he tutored D.J. and O.J. for free and that he enjoyed it. He said both D.J. and O.J. expressed their desire for Schoemann to be their grandfather. He testified that he created the agreements saying he would be like a grandfather to the boys so that "there would be something between the two boys and myself as to where we stand." He said he wanted to be a grandfather figure because "they were great kids and they both enjoyed being around me and I enjoyed being around them." Schoemann testified he had no ulterior motive.

Schoemann testified that he asked D.J. and O.J.'s mother for permission to take the boys to his home each time and that it was granted. He stated that when he touched O.J.'s knee, it was

because he was checking to ensure O.J.'s seatbelt was on. He also testified he "tapped him on the butt," because that's what you do when you play sports.

Schoemann testified that when he took D.J. to his home in Nehawka, they loaded the lawnmower, then D.J. asked to use the restroom. Schoemann testified he showed D.J. where the restroom was and then started cleaning up around the house. Schoemann testified that when D.J. came out of the bathroom, he was lying on Schoemann's bed and had removed his shirt and pants. Schoemann testified he told D.J. that they needed to leave the house, and D.J. started talking about the stains on the towels. Schoemann stated he would not have gone into the house in Nehawka with D.J. if he had not asked to use the restroom.

Schoemann testified he asked D.J. if he had hair in his private parts, because it is dangerous for a boy to lift weights if he had not started puberty. He testified that D.J. lifted in Schoemann's bedroom because there was no room in the living room. Schoemann testified he told D.J. to lie on the bed and rest after the last set because D.J. complained about his arms and legs bothering him. Schoemann said at that point, he took his hand and checked for possible muscle tie-ups. Schoemann testified D.J. asked him if D.J. had a "fat ass" because a girl told him that he did. Schoemann stated that he did squeeze D.J.'s buttocks, because he thought he saw a black and blue mark across D.J.'s buttocks and he wanted to check for bruising. Schoemann stated that he was concerned about a potential abusive relationship between D.J. and his father.

At the conclusion of all the evidence, the case was submitted to the jury. The jury returned a guilty verdict. The district court accepted the jury's verdict and ordered a presentence investigation.

Schoemann's sentencing hearing was held on May 13, 2013. The district court sentenced Schoemann to 20 months' to 4 years' imprisonment. Schoemann timely appeals.

## ASSIGNMENTS OF ERROR

Schoemann asserts on appeal that the district court erred in admitting evidence of certain prior acts under rule 404(2). Schoemann also asserts the evidence was insufficient to support a guilty verdict.

## STANDARD OF REVIEW

It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), and rule 404, and the trial court's decision will not be reversed absent an abuse of discretion. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

When reviewing a criminal conviction for sufficiency of evidence to sustain a conviction, the relevant question for the appellate court is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

An appellate court's standard of review for criminal cases requires substantial deference to the factual findings made by the jury. *State v. Kelly*, 20 Neb. App. 871, 835 N.W.2d 79 (2013).

ANALYSIS

*Admission of Rule 404 Evidence.*

Rule 404(2) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rules 403 and 404(2), and the trial court's decision will not be reversed absent an abuse of discretion. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

An appellate court's analysis under rule 404(2) considers whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. Payne-McCoy*, 284 Neb. 302, 818 N.W.2d 608 (2012).

*Relevance of Rule 404 Prior Acts.*

Prior to trial, the State sought to introduce testimony of O.J., D.J.'s brother, concerning a similar series of events that occurred involving Schoemann. The State filed an amended motion of intent to present rule 404 evidence. After a hearing on the State's motion, the motion to present O.J.'s testimony was granted, allowing the evidence to be adduced for the purpose of proving intent, motive, and a common plan.

The testimonies of D.J. and O.J. reveal similarities between the experiences of both boys, occurring within a very similar timeframe, i.e., a common plan. Schoemann gave both boys gifts of trinkets, clothing, and candy. He tutored both boys in a public place, asked them to sign an agreement to do whatever Schoemann asked of them, and then asked them to go with him to his home. Both boys testified Schoemann gave them a tour of his home, sat with them in his bedroom, and made unsolicited comments of a sexual nature. Both boys were asked to change their clothes and were in physical contact with Schoemann. These incidents occurred within a week of each other. The State had the burden to prove that the evidence was independently relevant for a proper purpose. *State v. Payne-McCoy, supra.* The State met the burden of showing the evidence was entered to show motive, intent, or a common plan.

*Probative Value Versus Unfair Prejudice.*

Evidence that is admissible under rule 404(2) may be excluded under rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Payne-McCoy, supra.* Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. *Id.*, citing *State v. Pullens, supra.* Only evidence tending to suggest a decision on an improper basis is unfairly prejudicial. Unfair prejudice means undue tendency to suggest a decision based on an improper basis, and balancing the probative value of evidence

against the danger of unfair prejudice is also within the discretion of the trial court. *Id.*, citing *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994).

At trial, Schoemann objected to the testimony of O.J. based on rules 403 and 404(2). The objection was overruled, and the trial court found the evidence was not unfairly prejudicial to Schoemann.

Having determined there was sufficient evidence to prove Schoemann's behavior with O.J. was relevant to prove intent, motive, or a common plan, we now consider whether the evidence was unfairly prejudicial.

The evidence provided at trial was highly probative to demonstrate how Schoemann's actions with D.J. and O.J. progressed in a similar manner. The question is whether such evidence was unfairly prejudicial. There are overwhelming similarities between how Schoemann acted with both boys, and we conclude that the probative value of Schoemann's actions with O.J. to show a common plan, motive, or intent, was not substantially outweighed by the prejudicial value and that Schoemann was not unfairly prejudiced by the admission of such evidence.

*Limiting Instructions.*

The jury was given a limiting instruction regarding O.J.'s testimony. O.J.'s testimony was admitted with an instruction to the jury that it could only be considered for purposes concerning intent, motive, and a common plan.

Schoemann asserts on appeal that O.J.'s testimony lacks evidence of intent, motive, and a common plan, and was just introduced to show he acted in conformity with character, which is not a permissible purpose under rule 404(2). The State asserts there was sufficient similarity between the testimony of D.J. and O.J. to properly enter O.J.'s testimony as evidence.

Upon our review, we find O.J.'s testimony was not offered to prove an element of Schoemann's character or his conformity therewith; rather, it was used to show intent, motive, and/or a common plan. We find that the trial court did not abuse its discretion in admitting O.J.'s testimony for the limited purposes stated at trial and that the trial court's ruling on such evidence should be affirmed.

*Sufficiency of Evidence.*

Schoemann was charged with third degree sexual assault of D.J.

Under the Nebraska Statutes, "[s]exual contact" is defined as "the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01."

Neb. Rev. Stat. § 28-318(5) (Cum. Supp. 2012). "[I]ntimate parts" is defined by § 28-318(2) as the "genital area, groin, inner thighs, buttocks, or breasts."

Schoemann asserts there is insufficient evidence to find he touched D.J.'s buttocks for sexual gratification or a sexual purpose; therefore, he asserts the court could not have found there was sufficient evidence that the State proved the essential elements of the charged crime beyond a reasonable doubt. Schoemann admits that he touched D.J., but asserts he had a legitimate reason--he thought he saw bruising on D.J.'s buttocks and feared physical abuse.

However, there is significant evidence that Schoemann's actions were sexually motivated. On the day of the alleged assault, Schoemann presented D.J. with a handwritten contract and asked D.J. to sign. The contract stated, among other things, "I promise to obey and do what [Schoemann] says so I will become a better man in the future. I promise to love him as a grandfather and listen to what he has to say." D.J. testified that Schoemann asked him to talk about "sex stuff" and asked D.J. to sit on his lap and kiss him on the cheek. D.J. testified that on the same day, Schoemann offered him $5 to remove his shirt, $10 to remove his pants, and $20 to remove all of his clothing.

While D.J. was lifting weights at Schoemann's house that day, Schoemann asked him to lie down on the bed between sets. D.J. testified Schoemann checked his pulse by placing his hand on D.J.'s chest, and then on his inner thigh. Schoemann told D.J. he had a "cute butt" and instructed him to roll over on his stomach. D.J. testified Schoemann placed his hand underneath D.J.'s boxer shorts and squeezed each buttock, then told D.J. to get dressed. D.J. testified that the incident made him uncomfortable.

Our standard of review does not permit us to resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence. Any conflicts in the evidence or questions concerning the credibility of witnesses were for the jury as finder of fact to resolve. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

Upon our review of the evidence, we find there was sufficient evidence for a rational trier of fact to find the essential elements of a crime beyond a reasonable doubt.

## CONCLUSION

We find the trial court did not abuse its discretion in allowing rule 404 evidence, with the appropriate limiting instruction. We also find there was sufficient evidence to find a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt.

AFFIRMED.