OPINION OF THE SUPREME COURT OF NEBRASKA


NOTICE: DUE TO UNFORESEEN CIRCUMSTANCES, THIS OPINION IS BEING POSTED
TEMPORARILY IN "SLIP" OPINION FORM. IT WILL BE REPLACED AT A LATER
DATE WITH AN "ADVANCE" OPINION, WHICH WILL INCLUDE A CITATION.


Case Title

STATE OF NEBRASKA, APPELLEE,
V.
GREGORY S. DUNCAN, APPELLANT.


Case Caption

STATE V. DUNCAN


Filed April 15, 2016.    No. S-15-668.


Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF,
Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Cindy A. Tate, and Korey T.
Taylor for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

STATE v. DUNCAN

Filed April 15, 2016.   No. S-15-668.

1. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

2. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.

3. **Sentences: Words and Phrases: Appeal and Error.** An appellate court reviews criminal sentences for abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?

5. **Criminal Law: Motions to Dismiss: Directed Verdict: Waiver: Convictions: Appeal and Error.** In a criminal trial, after a court overrules a defendant's motion for a dismissal or a directed verdict, the defendant waives any right to challenge the trial court's ruling if the defendant proceeds with trial and introduces evidence. But the defendant may challenge the sufficiency of the evidence for the conviction.

6. **Directed Verdict: Appeal and Error.** When a defendant makes a motion at the close of the State's case in chief and again at the conclusion of all the evidence, it is proper to assign as error that the defendant's motion for directed verdict made at the conclusion of all the evidence should have been sustained.

7. **Criminal Law: Directed Verdict.** In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed.

8. **Jury Instructions.** In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute.

9. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

10. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

11. **Jury Instructions.** In instructing a jury, the trial court is not required to define language commonly used and generally understood.

12. **Sentences.** When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the offense. The sentencing court is not limited to any mathematically applied set of factors.

13. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

14. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

15. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

16. ____: ____. To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

17. ____: ____. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

18. **Effectiveness of Counsel: Presumptions: Appeal and Error.** The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice.

19. **Effectiveness of Counsel: Proof.** In an ineffective assistance of counsel claim, deficient performance and prejudice can be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to lack of sufficient prejudice, that course should be followed.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, STACY, and KELCH, JJ.

CASSEL, J.

## I. NATURE OF CASE

A statute[1] enhances the penalty for third degree assault when it is committed because of the victim's association with a person of a certain sexual orientation. Gregory S. Duncan appeals from a conviction and sentence pursuant to this statute. There are two principal issues. We first consider whether the State introduced evidence sufficient to withstand Duncan's renewed motion for a directed verdict. It did. Second, we find no error in the district court's refusal of Duncan's requested jury instruction defining "sexual orientation." And finding no merit to Duncan's other assignments of excessive sentence and ineffective assistance of counsel, we affirm Duncan's conviction and sentence.

## II. BACKGROUND

Duncan was convicted of third degree assault, discrimination based, for punching Ryan Langenegger outside a restaurant in Omaha, Nebraska. Third degree assault, discrimination based, is a Class IV felony punishable by a maximum of 5 years' imprisonment and a $10,000 fine.[2] He was sentenced to 12 to 18 months in prison and given credit for 53 days of time served.

The statute that provides enhanced penalties for discrimination based offenses provides, in relevant part:

> Any person who commits one or more of the following criminal offenses against a person or a person's property because of the person's . . . sexual orientation . . . or because of the person's association with a person of a certain . . . sexual orientation . . . shall be punished by the imposition of the next higher penalty classification than the penalty classification prescribed for the criminal offense, unless such criminal offense is already punishable as a Class IB felony or higher classification: . . . assault in the third degree, section 28-310 . . . .[3]

At trial, Duncan admitted that he punched Langenegger but claimed that the punch was not motivated by Langenegger's association with a person of a certain sexual orientation. This is his direct appeal.

### 1. STATE'S CASE IN CHIEF

The State presented testimony that before the assault, Langenegger attended a "drag show" at a "gay bar" with two friends, Joshua Foo and Jacob Gellinger. Langenegger is heterosexual, and Foo and Gellinger are homosexual. Langenegger was wearing a men's suit, Foo was wearing pants and a suit jacket over a women's sequined top, and Gellinger was wearing a dress, platform shoes, makeup, and a wig. Gellinger is a tall person, and the platform

---

[1] Neb. Rev. Stat. § 28-111 (Cum. Supp. 2014).

[2] Neb. Rev. Stat. § 28-310 (Reissue 2008); § 28-111; Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014).

[3] § 28-111.

shoes made him appear around 6 feet 5 inches tall. When Gellinger is dressed in women's clothing, Gellinger "go[es] by Fendi Blu," which is an "alter ego" or "drag persona." Gellinger was generally identified as "Fendi Blu" at trial, and we do the same in this opinion.

Around 2 a.m., Foo, Langenegger, and Fendi Blu left the bar together and went to a restaurant. Fendi Blu was intoxicated, but Foo and Langenegger were not. While they were sitting at the restaurant, Foo noticed a group of three men who were "kind of like joking" and "kept looking over at our table and things." Foo, Langenegger, and Fendi Blu did not know who the men were at the time, but they were later identified at trial as Duncan, Joseph Adriano, and Paul Larson. The men's behavior made Foo feel "uneasy being there at the moment," so he asked Langenegger and Fendi Blu to leave.

While they waited for Langenegger to finish his food, Foo saw Adriano walk over to their table. Foo testified that Adriano looked over to his friends and said, "'Should I, should I?'" Foo thought Adriano's tone "wasn't . . . very good," and he told Langenegger and Fendi Blu, "'We need to go.'" Fendi Blu and Langenegger gathered their things, and as they were leaving, Foo heard the men laughing and calling out derogatory names as they walked away, including the word "'fag.'" At trial, counsel for the State asked Foo whether "'fag'" is "a derogatory word for homosexuals," and Foo responded, "Yes."

Both groups exited the restaurant. Once outside, Foo helped put on Fendi Blu's shoes, and Duncan's group stopped in front of Foo's group. Foo testified that Adriano walked up to Fendi Blu, looked over at Duncan and Larson, and said, "'Should I?'" as they laughed behind him. Duncan and Larson stood a few feet behind Adriano. Langenegger heard Adriano say, "'Faggot,'" and Foo heard someone say the word "'queer.'" Langenegger and Foo both testified that Fendi Blu then looked down and said, "'I know. I'm just a boy in a dress,'" and Adriano responded, "'Yeah, it's fucking disgusting.'"

Langenegger then "tried to calm down the situation," saying, "'Listen, we just want to go home,'" and Adriano responded, "'Come on, you fucking pussy.'" Langenegger began to state again that they just wanted to go home, but before he could finish speaking, he was punched in the face by Duncan. Langenegger and Foo testified that Langenegger did not make any threatening gestures, raise his voice, or touch Adriano or anyone else during this exchange.

After the punch, Duncan, Adriano, and Larson walked away, and Foo and Langenegger heard them laughing. Langenegger touched his face, and his hands came away covered with blood. He had "blood coming from his nose, in between his eyes, coming down his chin." Foo, Langenegger, and Fendi Blu proceeded to Langenegger's car, where Foo called the 911 emergency dispatch service and reported the incident. When the police arrived, Langenegger decided not to file a report because he "didn't think [Duncan, Adriano, and Larson] were going to get caught."

After speaking with the police, Foo and Langenegger drove Fendi Blu home and then drove to Foo's house. Foo took a photograph of Langenegger "to kind of document, like, what happened," and he posted the photograph on his personal "Facebook" page. He hoped that by posting about the assault online, someone might identify the attacker.

The police communicated with Foo and Langenegger after the photograph was posted. Langenegger made a formal report of the incident, and detectives identified Larson after obtaining his credit card information from the restaurant. Through Larson, detectives identified

Duncan and Adriano. A detective testified that when he arrested Duncan, Duncan "did not seem to be [surprised] at all" that he was being arrested for a "hate crime."

Adriano and Larson also testified during the State's case in chief. Adriano testified that he remembers drinking at several bars that night, but that he does not remember leaving the bars or anything that occurred at the restaurant because he had a "blackout" from drinking. He said that he does not recall using the word "faggot" and that he does not use that word because he has close friends and family friends who are homosexuals. He also testified that he was not aware until later that anyone was assaulted.

Larson testified that when they exited the restaurant, he and Duncan were a few feet behind Adriano, and that he observed Adriano and Langenegger talking to each other, but could not hear what they were saying. After Duncan punched Langenegger, Larson saw Langenegger fall and get back up, and he also saw Adriano fall or stumble, but he did not see Langenegger touch Adriano.

## 2. MOTION FOR DIRECTED VERDICT

After this evidence was adduced, the State rested and Duncan moved for a directed verdict of acquittal on the charge of discrimination-based assault. He argued that the State had not met its burden "to show that there was some evidence that [Duncan] specifically targeted or selected [Langenegger] as a result or because he was associated with -- he was associated with the gay people in this crowd."

The court stated that it had researched the interpretation of "'because of'" in other jurisdictions and discovered that they take one of three approaches. It said that some jurisdictions hold that sexual orientation must be the "sole reason" for the assault, some jurisdictions apply a "'but-for' test," and others have stated that the victim must have been "selected substantially because of [his or her] association with a particular sexual orientation." The court concluded that a Nebraska court "would probably be in line with the substantial factor case law." And it overruled Duncan's motion, explaining that although the State had not presented direct evidence of Duncan's making outward slurs, the testimony presented was sufficient to support an inference of a discriminatory motive.

## 3. DUNCAN'S CASE IN CHIEF AND RENEWED MOTION

Duncan's case in chief consisted of his own testimony. He testified that Langenegger pushed Adriano and that he punched Langenegger to defend Adriano. He said he did not know or consider the sexual orientation of Langenegger or anyone else that night. He admitted that he was an arm's length away when Adriano was face-to-face with Langenegger, but he claimed that he did not hear what they said to one another.

Duncan also testified that he did not notice Foo's group or stare at them and that he had no idea that any homosexual people were in Foo's group. He did not hear Adriano make any slurs against homosexual people, and he does not remember seeing a man dressed as a woman in the restaurant.

After Duncan testified, he renewed his motion for a directed verdict of acquittal. He argued again that the evidence did not establish that he targeted Langenegger because of his association with people of a certain sexual orientation. The court overruled the motion.

## III. ASSIGNMENTS OF ERROR

Duncan assigns, restated and consolidated, that the district court erred in (1) overruling his motions for a directed verdict, (2) denying his requested jury instruction, and (3) imposing an excessively harsh sentence. He also claims that he received ineffective assistance of counsel.

## IV. STANDARD OF REVIEW

[1] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[4]

[2] Whether a jury instruction is correct is a question of law, which an appellate court independently decides.[5]

[3] An appellate court reviews criminal sentences for abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

[4] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[7] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?[8]

## V. ANALYSIS

### 1. DIRECTED VERDICT

#### (a) Waiver

Duncan assigns that the district court erred in overruling both his motion for a directed verdict and his renewed motion for a directed verdict. In his assignments related to his motion for a directed verdict, he argues that the court misinterpreted the phrase "because of" in the enhancement statute and that it should have found that the State presented insufficient evidence to support a conviction under that statute. In his assignment related to his renewed motion, he

---

[4] *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003).

[5] *Warner v. Simmons*, 288 Neb. 472, 849 N.W.2d 475 (2014).

[6] *State v. Collins*, 292 Neb. 602, 873 N.W.2d 657 (2016).

[7] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

[8] *Id.*

argues again that the State presented insufficient evidence to support his conviction under the enhancement statute.

[5] The State responds that Duncan waived any right to challenge the district court's ruling on either motion because he proceeded with the trial and presented evidence. In support of its position, it cites *State v. Seberger*,[9] where we stated the well-established rule that in a criminal trial, after a court overrules a defendant's motion for a dismissal or a directed verdict, the defendant waives any right to challenge the trial court's ruling if the defendant proceeds with trial and introduces evidence, but the defendant may challenge the sufficiency of the evidence for the conviction.

The State's argument regarding Duncan's first motion for a directed verdict is correct. Because Duncan proceeded with the trial and presented evidence, he waived any right to challenge the district court's ruling on that motion.

[6] However, the State incorrectly argues that the waiver rule applies to Duncan's renewed motion. We said in *State v. Severin*[10] that

> [w]hen a defendant makes a motion at the close of the State's case in chief and again at the conclusion of all the evidence, it is proper to assign as error that the defendant's motion for directed verdict made at the conclusion of all the evidence should have been sustained."

Thus, it is proper for us to address whether the district court should have sustained Duncan's renewed motion for a directed verdict.[11] We clarify that this is the correct rule, but in the instant case, it makes little difference, because in Duncan's renewed motion, he complained only that the evidence was insufficient to support his conviction.

### (b) Renewed Motion for Directed Verdict

Duncan claims that the district court should have granted his renewed motion for a directed verdict because the evidence was insufficient to support a conviction under the enhancement statute. In order to obtain an enhanced penalty, the State was required to prove that Duncan assaulted Langenegger because of Langenegger's association with a person of a certain sexual orientation.[12] Essentially, Duncan argues that the State did not meet its burden because it did not present direct evidence that he was aware that Foo and Fendi Blu were homosexual.

[7] In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained.[13] If there is any evidence which will sustain a finding for the party against whom a

---

[9] *State v. Seberger*, 284 Neb. 40, 815 N.W.2d 910 (2012).

[10] *State v. Severin*, 250 Neb. 841, 849, 553 N.W.2d 452, 457 (1996).

[11] See *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

[12] See § 28-111.

[13] *State v. Cook, supra* note 4.

motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed.[14]

To determine whether there was a complete failure of evidence to establish that Duncan assaulted Langenegger because of his association with a person of a certain sexual orientation, we first consider the meaning of the phrase "because of." We have discussed the phrase on two previous occasions. In *Wymore v. Farmers Mut. Ins. Co. of Nebraska*,[15] we turned to the dictionary and concluded that in the context of an insurance contract, "because of" meant "'by reason of: on account of.'" Similarly, in *City of Gordon v. Ruse*,[16] we concluded that in the context of a statute requiring reimbursement of expenses incurred "because of" condemnation proceedings, "[t]he plain, ordinary, or common meaning of the phrase 'because of' is 'as a result of' or 'in connection with.'" Thus, the phrase "because of" in the enhancement statute requires the State to prove some causal connection between the victim's association with a person of a certain sexual orientation and the assault.[17]

We have often discussed causation in criminal cases. We have said that criminal conduct is a cause of an event if the event in question would not have occurred but for that conduct; conversely, conduct is not a cause of an event if that event would have occurred without such conduct.[18]

But this is the first time that we must apply the concept to a defendant's motive rather than his conduct. This concept of causation is ordinarily used to determine whether a defendant's conduct is the cause of another's injury or loss. Under the language of the statute at issue here, we must adapt it to the context of a defendant's motive as a cause of his behavior.[19] Applying our causation principles by analogy, the phrase "because of" in the enhancement statute required the State to prove that Duncan would not have assaulted Langenegger but for his association with a person of certain sexual orientation. Under our highly deferential standard of review, the State did so.

The evidence was sufficient to prevent a directed verdict on the enhancement charge. First, although Duncan claimed that he did not know that Foo and Fendi Blu were homosexual, the State introduced evidence sufficient for a jury to infer that he did. The State presented testimony that Duncan, Adriano, and Larson were sitting together at the restaurant when Foo heard members of Duncan's group call out derogatory names for homosexuals as he, Langenegger, and Fendi Blu exited the restaurant. A rational jury could infer that even if Duncan

---

[14] *Id.*

[15] *Wymore v. Farmers Mut. Ins. Co. of Nebraska*, 182 Neb. 763, 764, 157 N.W.2d 194, 195 (1968) (quoting Webster's Third New International Dictionary, Unabridged 194 (1961)).

[16] *City of Gordon v. Ruse*, 268 Neb. 686, 691, 687 N.W.2d 182, 186 (2004).

[17] See, *In re M.S.*, 10 Cal. 4th 698, 896 P.2d 1365, 42 Cal. Rptr. 2d 355 (1995) (interpreting "because of" to require evidence of causal connection between victim's status and act); *State v. Hennings*, 791 N.W.2d 828 (Iowa 2010) (same); *Matter of Welfare of S.M.J.*, 556 N.W.2d 4 (Minn. App. 1996) (same); *State v. Plowman*, 314 Or. 157, 838 P.2d 558 (1992) (same).

[18] *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005).

[19] See *In re M.S., supra* note 17 (Kennard, J., concurring).

did not say the derogatory names himself, he heard them. Additionally, while Duncan stood close enough to lunge and punch Langenegger outside the restaurant, Langenegger heard Adriano say, "'Faggot,'" and Foo heard someone say the word "'queer.'" A rational jury could find that Duncan did in fact hear those words and that he therefore believed that Langenegger was with people who were homosexual.

Second, the State presented evidence to show that Langenegger's association with homosexual people was the reason for the assault. The State's witnesses testified that there was no other apparent motivation. Langenegger testified that he had not spoken to Duncan before the assault, and Foo, Langenegger, and Larson all testified that Langenegger did not touch Adriano or anyone else in Duncan's group. A rational jury could infer from this evidence that Duncan's motivation was his belief that Langenegger was associated with homosexual people. Therefore, the district court properly overruled Duncan's renewed motion for a directed verdict.

## 2. JURY INSTRUCTION

Duncan argues that the district court should have accepted his requested instruction, which provided: "'Sexual orientation' means heterosexuality, homosexuality, or bisexuality." Nebraska statutes do not define the term. The court declined to give the instruction, reasoning that "[p]articularly in light of the facts of this case," which involved only "homosexual and heterosexual" people, the term sexual orientation was a matter of common understanding. It instructed the jury that in order to find Duncan guilty of third degree assault, discrimination based, it had to find:

1. That [Duncan], on or about October 27, 2013, did intentionally or knowingly cause bodily injury to . . . Langenegger;

2. [Duncan] did so because of . . . Langenegger's association with a person of a certain sexual orientation;

3. That [Duncan] did so in Douglas County, Nebraska; and

4. That [Duncan] did not act in defense of another.

[8-10] In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute.[20] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[21] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[22]

---

[20] *State v. Armagost*, 291 Neb. 117, 864 N.W.2d 417 (2015).

[21] *Id.*

[22] *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[11] Jurors are accepted because they are men and women of common sense and have a common understanding of words ordinarily used in our language.[23] In instructing a jury, the trial court is not required to define language commonly used and generally understood.[24]

Under the facts of the instant case, the term "sexual orientation" was a word commonly used and generally understood. The term was used throughout the jury selection process and the trial, and there is no indication in the record that it produced confusion. For instance, during jury selection, counsel for the State told the jury: "I'm interested in knowing your thoughts regarding this discrimination-based law, as well as sexual orientation in general." He then asked if any juror either identified as "gay, lesbian, bisexual, or transgendered or [had] a close friend or family member who identifies themselves as such," and prospective jurors responded. No prospective juror asked what any of those terms meant. Furthermore, when the State's counsel asked whether "anyone here that does not personally know someone who identifies themsel[ves] as lesbian, gay, bisexual, or transgendered," no prospective juror responded that he or she did not. Clearly, the prospective jurors were familiar with the concept of sexual orientation.

Additionally, counsel for the State asked whether "anyone believe[d] that discrimination-based laws such as this should not include sexual orientation" and whether anyone felt "any type of conflict inside them about their ability to be fair and impartial in a case involving sexual orientation." Again, no juror asked him to define or explain the term. And Duncan's counsel also used the term "sexual orientation" with no apparent problems. He told the prospective jurors: "So what we're talking about here is a case involving an assault, an assault on somebody who was associated with a gay person or supposed gay person. Really, the term is sexual -- sexual orientation. Gay is kind of a term we're loosely using here."

This is not a case where the court failed to instruct the jury on a legal concept with a particular meaning in the law.[25] The district court did not need to define "sexual orientation," because the term was a matter of common understanding under the facts of this case. Even if we assume that the proposed instruction was a statement of law and that it was a correct one, Duncan has shown no prejudice from the court's refusal of the instruction. This assignment of error is without merit.

### 3. EXCESSIVE SENTENCE

Duncan argues that the sentence of 12 to 18 months in prison was excessive. The 12- to 18-month sentence was well within the statutory limits for third degree assault, discrimination based, which is a Class IV felony and was at that time punishable by a maximum of 5 years'

---

[23] *Johnson v. Batteen*, 144 Neb. 384, 13 N.W.2d 625 (1944).

[24] *Omaha Nat. Bank v. Manufacturers Life Ins. Co.*, 213 Neb. 873, 332 N.W.2d 196 (1983). See, also, *Johnson v. Griepenstroh*, 150 Neb. 126, 33 N.W.2d 549 (1948) (concluding no need to define "right of way"); *Suiter v. Epperson*, 6 Neb. App. 83, 571 N.W.2d 92 (1997) (concluding no need to define "lookout" and "control").

[25] See, e.g., *Danielsen v. Eickhoff*, 159 Neb. 374, 66 N.W.2d 913 (1954) (failing to define "proximate cause").

imprisonment and a $10,000 fine.[26] An appellate court will not disturb sentences that are within statutory limits, unless the district court abused its discretion in establishing the sentences.[27]

[12,13] When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the offense.[28] The sentencing court is not limited to any mathematically applied set of factors.[29] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[30]

Duncan contends that the sentence was an abuse of discretion, because the court made a statement at trial that "it was a 'close call' that there was even enough there to go to the jury on the enhancement and make this more than a misdemeanor crime."[31] He notes that he maintained "even in apologizing to the court at sentencing that '[i]n absolutely no way was it intentionally to harm someone because of [his or her] sexual orientation.'"[32] And he claims that his "criminal convictions record was minimal."[33]

At sentencing, the district court stated that it considered Duncan's age, experience, background, criminal history, the type of offense, and his motivation for the offense. It noted that Duncan has a criminal history, including a prior felony arrest for possession with intent to deliver a controlled substance. It also explained that the presentence investigation report was incomplete because Duncan failed to participate, even though they "[c]ontacted [him] on a number of occasions." And it observed that because Duncan did not appear for sentencing, the court had to issue a warrant. The court stated that "those types of behaviors" showed that Duncan has a "disregard for court orders."

The court also considered the gravity of the offense. It explained that the Legislature has determined that crimes motivated by bias should be punished differently than those that are not and that "discrimination-motivated crimes do have a different impact on . . . our social fabric." But it also noted that Duncan's crime "did not involve significant violence."

The district court's statements show that it considered appropriate factors in fashioning Duncan's sentence. What Duncan is really arguing is that there was insufficient evidence to convict him under the enhancement statute. We have already concluded that the evidence was sufficient, and the jury found that Duncan targeted Langenegger because of his association with

---

[26] §§ 28-310, 28-111, and 28-105.

[27] *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015).

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Brief for appellant at 38.

[32] *Id.*

[33] *Id.*

people of a certain sexual orientation. The district court did not abuse its discretion in imposing a sentence of 12 to 18 months' imprisonment.

### 4. Ineffective Assistance

Duncan contends that he received ineffective assistance of counsel. He complains that his counsel insinuated that Foo manipulated a photograph when he should have known that Foo did not do so and that he pursued an "inconsistent and arguably illogical or demeaning theory of defense," which prejudiced him.[34]

[14] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[35] The determining factor is whether the record is sufficient to adequately review the question.[36] We conclude that the record is sufficient to address all of Duncan's ineffective assistance claims.

[15-17] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[37] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.[38] To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[39] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[40]

[18,19] The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice.[41] Deficient performance and prejudice can be addressed in either order.[42] If it is more appropriate to dispose of an ineffectiveness claim due to lack of sufficient prejudice, that course should be followed.[43]

With these principles in mind, we examine each error that Duncan alleges his counsel committed. Duncan claims that his counsel was ineffective because he (1) asked Foo whether he manipulated a photograph, (2) introduced a "'sex on the sidewalk'" theory, and (3) made "demeaning and disparaging" comments about the victim and the State's witnesses during his

---

[34] *Id.* at 33.

[35] *State v. Watt, supra* note 22.

[36] *Id.*

[37] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[38] *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

[39] *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013).

[40] *Id.*

[41] *State v. Watt, supra* note 22.

[42] *Id.*

[43] *Id.*

closing argument. The record conclusively shows that Duncan suffered no prejudice from any of these alleged deficiencies.

### (a) Photograph

During Duncan's counsel's cross-examination of Foo, he insinuated that Foo used his photography "morphing" skills to manipulate the photograph of Langenegger that Foo then posted on his "Facebook" page. Foo denied manipulating the photograph, and the police officer who spoke to Langenegger that night later testified that the photograph showed Langenegger "[a]lmost exactly" as he appeared when he spoke to him. Duncan argues that his defense was prejudiced, because the State received "an advantage or point with the jury" when it rebutted the "morphing" theory through the officer's testimony.[44]

We conclude that there is no reasonable probability that but for Duncan's counsel's questions regarding "morphing," Duncan would have been acquitted. Duncan admitted that he assaulted Langenegger and only disputed the reason for the assault. The photograph of Langenegger had no bearing on Duncan's motivation for the assault. Therefore, the record establishes that this instance of counsel's conduct was not prejudicial to Duncan.

### (b) "Sex on a Sidewalk" Theory

Duncan complains that his attorney attempted to introduce a "'sex on a sidewalk'" theory[45] at trial. Duncan claims this theory was "unsupported" and "like the defense was grasping at straws or throwing darts at a board to see what sticks so to speak when taken with the morphing and other things."[46] During the trial, Duncan's counsel asked Adriano, Langenegger, and Foo whether they saw what looked like sex on the sidewalk between Foo and Fendi Blu when Foo helped put on Fendi Blu's shoes, and they all denied that it looked that way.

Once again, there is no reasonable probability that but for this conduct, Duncan would have been acquitted. Duncan's counsel's questions about "sex on a sidewalk" apparently related to Adriano's reason for engaging in an altercation with Langenegger, which had no bearing on Duncan's defense. Duncan's defense hinged on his claim that he had no idea why Adriano was upset and that he never heard Adriano say anything at all to Langenegger. Therefore, this claim is also refuted by the record.

### (c) Demeaning Statements

Duncan points to nine statements made by his counsel during his closing argument that were "demeaning and disparaging to the victim and the State's witnesses."[47] He argues that his counsel's "illogical and/or demeaning theory of defense and characterization of the victim and witnesses in this case" prejudiced his defense.[48] The statements he complains of include the

---

[44] Brief for appellant at 34.

[45] *Id*. at 35.

[46] *Id.*

[47] *Id.*

[48] *Id.* at 37.

following: "[C]onsider the witnesses they are relying on. The man in drag, another gay man that lived a lie until he was 28 [when he told his parents he is homosexual], a person who has a political agenda"; and, "You got -- their witnesses all were involved and they've got gay agendas."

Whether the State's witnesses had "gay agendas" had no bearing on Duncan's motivation for the assault, which was the issue in this case. Obviously, the jury did not believe Duncan's testimony that the assault had nothing to do with anyone's sexual orientation. We conclude that there is no reasonable probability that but for Duncan's counsel's disparaging statements, Duncan would have been acquitted. The record conclusively refutes that Duncan was prejudiced by his counsel's conduct.

## VI. CONCLUSION

We conclude that there was sufficient evidence to prevent a directed verdict on the enhancement element. We also conclude that the district court did not err in denying Duncan's requested jury instruction, because "sexual orientation" was a matter of common understanding under the facts of this case. We conclude further that the district court's sentence was not an abuse of discretion and that Duncan did not receive ineffective assistance of counsel. We therefore affirm Duncan's conviction and sentence.

AFFIRMED.